Elizabeth GROSSMAN, Executrix of the Estate of Marjorie L. Dudley, Individually, and Gordon Dudley, Sr., Individually, Appellants,

v.

James N. BARKE, M.D., Appellee.

Superior Court of Pennsylvania.

Argued Sept. 14, 2004.
Filed Feb. 3, 2005.

---

Harold B. Fink, Port Allegany, for appellants.

Darryl R. Wishard, Williamsport, for appellee.

. BEFORE: JOYCE, BENDER and BOWES, JJ.

OPINION BY BENDER, J.:

¶ 1 Elizabeth Grossman, executrix of the estate of Marjorie L. Dudley, individually, and Gordon Dudley, Sr., (collectively, "Plaintiff") [1] appeal from the March 14, 2003 order granting summary judgment in favor of James N. Barke, M.D. ("Dr. Barke"). We affirm.

¶ 2 A factual and procedural history of this case follows. In her complaint filed in this matter, Plaintiff alleged that on or about April 20, 1998, Marjorie L. Dudley ("Mrs.Dudley") was in the office of her longtime family physician, Dr. Barke. *See* Complaint, 2/11/99, at ¶¶ 4, 5. Dr. Barke's office was located in or on the grounds of the Charles Cole Memorial Hospital. *Id.* at ¶ 4. On that date, Mrs. Dudley was 69 years old, weighed approximately 300 pounds, and was approximately 5'1" to 5'2" tall. *Id.* at ¶ 6; Plaintiff's Brief at 5. As asserted in the complaint, the purpose of Mrs. Dudley's visit to Dr. Barke was to "obtain a pre-examination for a knee replacement." Complaint, 2/11/99, at ¶ 4. However, in its brief, Plaintiff indicates that the purpose of the visit was for a "regular checkup." Plaintiff's brief at 5. In any event, at the time of the visit, Mrs. Dudley had sutures in her ankle from a previous surgical procedure. Complaint, 2/11/99, at ¶ 8. Mrs. Dudley asked Dr. Barke if he would remove the sutures, and,

---

**1.** Although there are two plaintiffs, *i.e.,* the estate and the husband of the deceased, we shall, for ease of comprehension, refer to both plaintiffs in the singular and feminine forms.

after agreeing to do so, Dr. Barke directed Mrs. Dudley to get on to the examination table at which time he left the room to find a suture removal kit. *Id.* at ¶¶ 9, 10. According to the complaint, Mrs. Dudley was "able to gain a sitting position on the examining table, however, before [Dr. Barke] returned she became dizzy or lost her equilibrium and fell from the examining table to the floor thereby incurring … severe injuries…." *Id.* at ¶ 12. The fall resulted in a fractured pelvis that required several surgeries from which Mrs. Dudley suffered various complications including a bacterial infection in the effected hip, which eventually required removal of the hip.

¶ 3 Plaintiff filed a complaint on February 11, 1999.[2,3] With regard to Dr. Barke, Plaintiff alleged that his negligence caused the injuries Mrs. Dudley suffered as a result of her fall from the examination table. As more fully described, *infra,* Plaintiff essentially contended that Dr. Barke, as Mrs. Dudley's family physician, should have known that she could not stay safely seated on the examination table after climbing on to it herself given her history of diabetes with associated dizzy spells and other aspects of her physical condition.

¶ 4 However, a question arose with regard to whether Plaintiff stated a cause of action sounding in medical malpractice or ordinary negligence. Plaintiff indicated that, at the pretrial conference, there was discussion about whether the complaint was legally sufficient to support a cause of action of ordinary negligence, *see* Motion in Limine, 6/7/02, at 1, where it appeared to the defense that Plaintiff's complaint against Dr. Barke sounded in medical malpractice. Plaintiff asserted that their expert, Jay D. Bayer, D.O., testified at his deposition that Plaintiff's case was "one of basic negligence as opposed to medical malpractice (if there be a difference)." *Id.* Consequently, on June 7, 2002, Plaintiff filed a motion *in limine* seeking, *inter alia,* a determination of whether Plaintiff's complaint sufficiently stated a cause of action for ordinary negligence against Dr. Barke, "as opposed to a medical malpractice cause of action, if there be a distinction or difference[.]" *Id.*

¶ 5 On August 29, 2002, following oral argument, the trial court denied Plaintiff's motion *in limine.* On January 7, 2003, the court issued an order setting forth its reasons for denying Plaintiff's motion *in limine.* Essentially, the trial court stated that expert medical testimony was necessary to explain diabetes and its symptoms to a jury of laypersons and to explain the standard of care of a physician dealing with a diabetic patient like Mrs. Dudley. The trial court concluded that the claims against Dr. Barke in Plaintiff's complaint were presented as medical negligence

---

2. In addition to setting forth the above allegations, the complaint brought two causes of action against Charles Cole Memorial Hospital primarily related to their alleged responsibility in causing the bacterial infection Mrs. Dudley contracted in the hospital around the time of her first hip surgery. However, the hospital settled with Plaintiff, leaving Dr. Barke as the sole remaining defendant. *See* Order, 8/29/02 (dismissing hospital from case). Accordingly, the hospital is not a party to this appeal.

3. Sadly, Mrs. Dudley died on February 18, 2002. Plaintiff indicates that, in this case, it is not asserting that Mrs. Dudley's death was related to injuries incurred from falling off of the examination table. *See* Plaintiff's brief at 7. Mrs. Dudley's daughter, Elizabeth Grossman, was appointed executor of Mrs. Dudley's estate. Mrs. Dudley's estate was substituted as plaintiff in lieu of Mrs. Dudley, individually. Mrs. Dudley's husband also remained a plaintiff, thereby continuing to assert his loss of consortium claim against Dr. Barke.

claims, not ordinary negligence claims, as his alleged negligence was premised upon his professional knowledge of diabetes and other aspects of Mrs. Dudley's physical condition (*i.e.*, age, weight, dexterity, etc.). Accordingly, the trial court denied Plaintiff's motion *in limine* based on its conclusion that the complaint was insufficient to state a cause of action for ordinary negligence. Notably, it appears that Plaintiff at no time sought to amend its complaint.

¶ 6 On January 27, 2003, Dr. Barke filed a motion for summary judgment, arguing that Plaintiff's claims were premised on medical negligence as opposed to ordinary negligence, and thereby required supportive expert testimony. Motion for Summary Judgment of Dr. Barke, 1/27/03, at ¶ 6. Dr. Barke contended that Dr. Bayer's expert testimony did not support the medical negligence claims against Dr. Barke, "either on standard of care or causation." *Id.* at ¶ 24.

¶ 7 In response to Dr. Barke's motion for summary judgment, Plaintiff argued that "the facts clearly predicate liability on ordinary negligence notwithstanding the fact that the negligence occurred in the doctor's office and on an occasion where the plaintiff's decedent was at the doctor's office per a regular appointment with her 'family doctor' . . . ." Answer to Motion for Summary Judgment, 2/24/03, at ¶ 6. Plaintiff further argued that Dr. Bayer's expert opinion and testimony supported a cause of action for ordinary negligence, *i.e.*, Dr. Bayer opined that Dr. Barke was aware of Mrs. Dudley's diabetes and associated dizzy spells and that asking her to "jump up on the table" without assistance constituted negligence and deviation from

the standard of care in terms of patient safety. *See id.* at ¶ 20. More specifically, Plaintiff argued that the complaint was sufficient to state a cause of action for ordinary negligence (which Plaintiff characterized as the "gravamen" of her complaint) because it averred that Dr. Barke was negligent in asking Mrs. Dudley to climb onto the examination table without assistance, that he allowed her to remain on the table unattended even though he knew that she was likely to lose her balance due to her diabetes and dizzy spells, and that he agreed to remove the sutures in her ankle without having the proper equipment immediately available. *See id.* at ¶ 21. Plaintiff argued that the factfinder in the case would not require the expertise of an expert medical witness to establish Dr. Barke's negligence. *See id.* The trial court rejected Plaintiff's arguments and, on March 14, 2003, issued an order granting Dr. Barke's motion for summary judgment and dismissing Plaintiff's complaint. On March 31, 2003, Plaintiff filed a timely notice of appeal.

¶ 8 In this appeal, Plaintiff argues that the trial court erred by granting summary judgment in favor of Dr. Barke because Dr. Bayer's testimony supported the negligence claim as set forth in the complaint[4] and because medical expert opinion was not required to prove Plaintiff's case of "liability and causation" given Mrs. Dudley's physical attributes (*i.e.*, elderly, short woman weighing over 300 pounds). *See* Plaintiff's Brief at 3.

¶ 9 Initially, we note the following:

---

4. Contrary to Plaintiff's argument on its motion *in limine,* whereby it claimed the suit presented a claim of ordinary negligence, Plaintiff now takes no stance in this appeal with regard to whether the suit should be characterized as ordinary negligence or medi-

cal malpractice. Rather, Plaintiff merely contends that its expert testimony supports the cause of action asserted in the complaint, without specifying how that cause of action should be characterized.

Summary judgment properly is granted after the close of the relevant pleadings "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report" and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2(1). The standard of our review of an order granting or denying a motion for summary judgment pursuant to Rule 1035.2 is well established. In reviewing an order granting summary judgment, an appellate court must examine the record in the light most favorable to the non-moving party. We will reverse only if there has been an error of law or a clear abuse of discretion.

*Morningstar v. Hallett*, 2004 PA Super 337, 6, 858 A.2d 125 (filed August 27, 2004) (case citations omitted). Our scope of review is plenary with regard to questions of law. *Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 258 (Pa.Super.1997). However, we are not bound by the trial court's conclusions of law and, instead, we may reach our own inferences and conclusions. *Id.*

¶ 10 As described above, Plaintiff argued to the trial court in its motion *in limine* that the case was one of ordinary negligence, not medical malpractice. The trial court, however, treated the case as a medical malpractice case. Even so, "when a plaintiff's medical malpractice claim sounds in negligence, the elements of the plaintiff's case are the same as those in ordinary negligence actions." *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 573 Pa. 245, 824 A.2d 1140, 1145 (2003). Negligence is established by proving the following four elements: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." *Estate of Swift by Swift v.*

*Northeastern Hosp.*, 456 Pa.Super. 330, 690 A.2d 719, 722 (1997). Moreover, in any negligence action, "establishing a breach of a legal duty is a condition precedent to a finding of negligence." *Id.*

¶ 11 Although the basic elements of both ordinary negligence and medical malpractice are the same, medical malpractice has distinguishing characteristics. Medical malpractice is further defined as the "unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Toogood*, 824 A.2d at 1145. The underlying elements of negligence in a medical malpractice claim, mirroring those of a basic negligence claim, *see Estate of Swift*, 690 A.2d at 722, are more specifically described as a "duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm." *Toogood*, 824 A.2d at 1145 (quoting *Hightower–Warren v. Silk*, 548 Pa. 459, 698 A.2d 52, 54 (1997)).

¶ 12 One of the most distinguishing features of a medical malpractice suit is, in most cases, the need for expert testimony, which may be necessary to elucidate complex medical issues to a jury of laypersons. In other words, "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons[,] a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." *Id.*

The expert testimony requirement in a medical malpractice action means that a plaintiff must present medical expert testimony to establish that the care and

treatment of the plaintiff by the defendant fell short of the required standard of care and that the breach proximately caused the plaintiff's injury. Hence, causation is also a matter generally requiring expert testimony.

*Id.* Indeed, "a jury of laypersons generally lacks the knowledge to determine the factual issues of medical causation; the degree of skill, knowledge, and experience required of the physician; and the breach of the medical standard of care." *Id.* at 1149. In such cases, "[t]he cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion .... [Without experts] we feel that the jury could have no basis other than conjecture, surmise or speculation upon which to consider causation." *Id.* (quoting *Woods v. Brumlop,* 71 N.M. 221, 377 P.2d 520, 523 (1962)). *See also Brannan v. Lankenau Hosp.,* 490 Pa. 588, 417 A.2d 196, 200 (1980) (indicating that the requirement of expert testimony in such cases "stems from judicial concern that, absent the guidance of an expert, jurors are unable to determine relationships among scientific factual circumstances"); *Lattanze v. Silverstrini,* 302 Pa.Super. 217, 448 A.2d 605, 608 (1982) (indicating that in a motor vehicle accident case, injured plaintiff still must establish the "causal relationship between the injury complained of and the alleged negligent act" and generally, causation must be established through expert medical testimony).

▮ ¶ 13 However, even in a negligence suit characterized as "medical malpractice," expert testimony is not always required if the alleged negligence is obvious or within the realm of a layperson's understanding. In *Matthews v. Clarion Hosp.,* 742 A.2d 1111 (Pa.Super.1999), we visited this concept in the context of a corporate liability claim against a hospital:

[A] claim of corporate negligence, *like a claim of medical malpractice,* requires that in cases where a hospital's negligence is not obvious, a plaintiff must establish through expert testimony that a hospital's acts deviated from an accepted standard of care and that the deviation was a substantial factor in causing plaintiff's harm. *Welsh v. Bulger,* 548 Pa. 504, 512–14, 698 A.2d 581, 585 (1997). Expert testimony is not, however, required to establish a breach of duty " 'where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons.' " *Id.* at n. 11, 698 A.2d at 585 n. 11, *quoting Chandler v. Cook,* 438 Pa. 447, 451 n. 1, 265 A.2d 794, 796 n. 1 (1970). *See also Brannan v. Lankenau Hospital,* 490 Pa. 588, 417 A.2d 196 (1980).

Nor is expert testimony as to *causation* required "where there is an *obvious* causal relationship" between the injury complained of and the alleged negligent act. *Lattanze v. Silverstrini,* 302 Pa.Super. 217, 448 A.2d 605, 608 (1982) (emphasis in original), *citing Smith v. German,* 434 Pa. 47, 253 A.2d 107 (1969). "An obvious causal relationship exists where the injuries are either an 'immediate and direct' or the 'natural and probable' result of the alleged negligent act." *Lattanze,* 448 A.2d at 608, *quoting Tabuteau v. London Guarantee & Accident Co., Ltd.,* 351 Pa. 183, 40 A.2d 396 (1945) (other citation omitted).

*Id.* at 1112 (emphasis added). *See, e.g., Brannan,* 417 A.2d at 201 (holding that a hospital staff's failure to monitor or notify the attending physician about an ICU patient's deteriorating vital signs despite the physician's explicit order that the patient's vital signs be monitored, did not require

expert testimony because the staff's breach constituted a "glaring example of want of care" and noting that expert testimony is not required when the "matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even non professional persons" (quoting *Chandler,* 265 A.2d at 796 n. 1)); *Cangemi v. Cone,* 774 A.2d 1262, 1266 (Pa.Super.2001) (holding that "the duty to formulate and adopt adequate rules and policies surrounding the delivery of x-rays and radiologist's reports are not beyond that of the average layperson" and therefore did not require expert testimony to establish negligence on part of hospital or radiologist for failure to forward a report revealing the presence of an abdominal aneurysm to the attending physician (citation omitted)); *Matthews,* 742 A.2d at 1113 (holding that claim of corporate negligence against hospital based on a shoulder injury incurred when the plaintiff fell off an operating room table sounded in corporate negligence, not medical malpractice and that trial court erred by requiring the plaintiff to present expert testimony).

¶ 14 Before we can answer the question of whether Plaintiff's expert testimony sufficiently supported its case, we must first examine whether this case should be characterized as medical malpractice or ordinary negligence. The parties do not present any case in which a Pennsylvania court has outlined factors to be considered when reading a complaint to determine whether the cause of action asserted therein constitutes ordinary negligence or medical malpractice. In fact, as previously noted, Plaintiff essentially asserts that no relevant distinction exists between the two. We disagree.

¶ 15 Indeed, the averments Plaintiff makes in its complaint will determine what theories of liability Plaintiff is asserting:

In this Commonwealth, the pleadings must define the issues and thus every act or performance essential to that end must be set forth in the complaint. The purpose behind the rules of pleading is to enable parties to ascertain, by utilizing their own professional discretion, the claims and defenses asserted in the case. This purpose would be thwarted if courts, rather than the parties, were burdened with the responsibility of deciphering the causes of action from a pleading of facts which obscurely support the claim.

While it is not necessary that the complaint identify the specific legal theory of the underlying claim, it must apprise the defendant of the claim being asserted and summarize the essential facts to support that claim. If a plaintiff fails to properly plead a separate cause of action, the cause he did not plead is waived.

*Estate of Swift,* 690 A.2d at 723 (citations omitted) (concluding that, based on averments in complaint, plaintiff who filed slip-and-fall action against hospital did not plead a case of medical malpractice but, rather, pleaded a case based on premises liability). *See also Yacoub v. Lehigh Valley Med. Assocs., P.C.,* 805 A.2d 579, 588 (Pa.Super.2002) (*en banc*), *appeal denied,* 573 Pa. 692, 825 A.2d 639 (2003) (indicating that "purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend" and that the "complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims"). However, we have also stated as follows:

Even though [the plaintiff] did not separate his factual allegations into separate counts specifying the legal theories underlying the complaint, the trial court was obligated to consider what causes of

action were supported by the facts alleged. Under Pennsylvania's fact pleading system, the complainant need only state the material facts upon which a cause of action is based. Pa.R.C.P. 1019(a). The duty to discover the cause or causes of action rests with the trial court.

*Bartanus v. Lis,* 332 Pa.Super. 48, 480 A.2d 1178, 1182 (1984) (case citations omitted). Moreover,

> [I]t is not enough to focus upon one portion of the complaint. Rather, in determining whether a particular paragraph in a complaint has been stated with the necessary specificity, such paragraph must be read in context with all other allegations in that complaint. Only then can the court determine whether the defendant has been put upon adequate notice of the claim against which he must defend.

*Yacoub,* 805 A.2d at 589.

¶ 16 Other jurisdictions have examined the issue of distinguishing a claim that sounds in medical malpractice from one that sounds in ordinary negligence, although "[t]he distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and no rigid analytical line separates the two...." *Weiner v. Lenox Hill Hosp.,* 88 N.Y.2d 784, 650 N.Y.S.2d 629, 673 N.E.2d 914, 916 (1996) (internal quotation marks omitted). *See also Toogood,* 824 A.2d at 1145 (indicating that basic elements are the same in ordinary negligence and medical malpractice). In describing the difference between the two types of claims, certain New York state courts, for example, have indicated that "[c]onduct is considered to be malpractice ... when it constitutes medical treatment, that is, when it involves diagnosis, care and treatment by licensed medical professionals." *Lee v. New York City Transit Auth.,*

175 Misc.2d 632, 668 N.Y.S.2d 1014, 1015 (N.Y.Sup.Ct.1998) (citing *Scott v. Uljanov,* 74 N.Y.2d 673, 543 N.Y.S.2d 369, 541 N.E.2d 398 (1989)). Similarly, one New York court, in the context of determining whether a complaint sounded in medical malpractice or ordinary negligence for statute of limitations purposes, stated that

> The essential question to be answered in determining the applicable statute of limitations is whether the conduct at issue constituted an integral part of the process of rendering medical treatment to ... [the patient]. For a cause of action to survive the shorter statute of limitations applicable to medical malpractice and continue to be viable under the longer statute of limitations applicable to negligence, the gravamen of the complaint should not be negligence in furnishing medical treatment or conduct which bears a substantial relationship to the rendition of medical treatment by a licensed physician, but rather must point to the hospital's failure in fulfilling a different duty.

*DeLeon v. Hospital of Albert Einstein Coll. of Med.,* 164 A.D.2d 743, 566 N.Y.S.2d 213, 215–16 (1991) (citations and quotation marks omitted). Stated conversely, "[w]here '[n]either specialized medical knowledge nor professional expert testimony is necessary to determine' the nature of the duty to the plaintiff which has allegedly been breached, and whether or not due care was exercised, an action sounds in simple negligence." *Id.* (quoting *Coursen v. New York Hosp.-Cornell Med. Center,* 114 A.D.2d 254, 499 N.Y.S.2d 52 (1986)).

¶ 17 For example, *Bryant v. Oakpointe Villa Nursing Ctr.,* 471 Mich. 411, 684 N.W.2d 864 (2004), was a case where a nursing home patient died of positional asphyxiation after getting caught between the mattress and bedrails on her bed. The patient's estate sued the nursing home,

alleging, *inter alia*, that the nursing home failed to properly train its staff to assess the risks of asphyxia and failed to inspect the patient's bed to prevent such occurrences. *Id.* at 867. In examining these claims, the Michigan Supreme Court drew a distinction between ordinary negligence and medical malpractice as follows:

> A medical malpractice claim is distinguished by two defining characteristics. First, medical malpractice can occur only within the course of a professional relationship. Second, claims of medical malpractice necessarily raise questions involving medical judgment. Claims of ordinary negligence, by contrast, raise issues that are within the common knowledge and experience of the [factfinder]. Therefore, a court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience. If both these questions are answered in the affirmative, the action is subject to the procedural and substantive requirements that govern medical malpractice actions.

*Id.* at 871 (citations and internal quotation marks omitted). The court concluded that specialized knowledge was required to assess the risk of potential asphyxiation posed by bedrails given a patient's medical history and behavior, and the same specialized knowledge is necessary to train employees to properly assess such risk and, therefore, involves medical judgment. *Id.* at 873–74. The court concluded that these claims sounded in medical malpractice rather than ordinary negligence. *Id.* at 874.

¶ 18 By way of further example, in the case of *Scott v. Uljanov, supra,* the New York Court of Appeals held that a claim "challeng[ing][a] hospital's assessment of the supervisory and treatment needs of [a] highly intoxicated patient during his initial emergency room care" sounded in medical malpractice. *Scott,* 543 N.Y.S.2d 369, 541 N.E.2d at 399. The plaintiff in *Scott* was highly intoxicated when he was placed in a hospital bed with the siderails up for safety purposes. *Id.* at 398. However, the plaintiff climbed out of the end of the bed and sustained a head injury. *Id.* The court characterized the complaint as medical malpractice because "the conduct at issue constituted an integral part of the process of rendering medical treatment to [the plaintiff]." *Id.* at 399.

¶ 19 Turning to the complaint in the instant case, we find that Plaintiff separated her causes of action into separate counts. Plaintiff's first cause of action against Dr. Barke contains the general heading "negligence." The only other count implicating Dr. Barke relates to Mr. Dudley's loss of consortium claim. Complaint, 2/11/99, at ¶¶ 14–26. However, we read the complaint as a whole to determine whether Dr. Barke had adequate notice of the claims against which he must defend. *See Yacoub,* 805 A.2d at 589.

¶ 20 We conclude that, pursuant to our examination of Plaintiff's complaint, Plaintiff was intending to proceed on a medical malpractice theory of negligence, rather than an ordinary negligence theory. For example, Plaintiff alleged that Mrs. Dudley's injuries were a result of Dr. Barke's negligence and "his failure to provide medical assistance . . . within a reasonably expected standard of care." Complaint, 2/11/99, at ¶ 15. Plaintiff averred that the purpose of Mrs. Dudley's visit with Dr. Barke, who had been her "family physician . . . for a substantial period of

time[,]" was to obtain a pre-examination for a knee replacement. *Id.* at ¶¶ 4, 5. Accordingly, Mrs. Dudley was present in the Charles Cole Memorial Hospital office of Dr. Barke to obtain medical services from him. Plaintiff stated that Dr. Barke "did, in fact, take on the duty as [Mrs. Dudley's] doctor of removing the sutures and asked [Mrs. Dudley] to get up on the examining table so that he could do so more easily than otherwise." *Id.* at ¶ 9. Plaintiff also averred that Mrs. Dudley was under the "professional care and control" of Dr. Barke at the time of the incident and that he "was negligent and failed to exercise the reasonably expected standard of care" because he instructed Mrs. Dudley to "climb on the examining table without any assistance" despite her age, weight, lack of dexterity and mobility, and despite the fact that "she was likely to lose her balance due to dizziness caused by her diabetes and/or other physical ailments[,]"of which Dr. Barke "knew, or should have known[.]" *Id.* at ¶ 15(a), (c). Indeed, Plaintiff averred that "[p]rior to and on the date [of the incident, Mrs. Dudley] had been and was suffering from diabetes and, therefore, was subject from time [sic] to dizzy spells, all of which was known by Dr. Barke as he had treated her for diabetes throughout a substantial period of time." *Id.* at ¶ 7. Plaintiff further averred that Dr. Barke was negligent in agreeing to remove the sutures when he did not have the necessary equipment in the room and in failing to have a nurse present to "make certain that [Mrs. Dudley] could present herself in a proper position to [Dr. Barke] so that [Dr. Barke] could remove the sutures." *Id.* at ¶ 16(d).

¶ 21 Given these averments, the trial court did not err by characterizing Plaintiff's theory of liability as medical malpractice. Plaintiff's theory of liability is premised on the physician-patient relationship and, in fact, Dr. Barke's duty is defined by Plaintiff within the context of the physician-patient relationship. Also, Dr. Barke's instruction to Mrs. Dudley to get on to the examination table was in preparation for the medical service he was to render, *i.e.,* removal of her sutures. But most telling is Plaintiff's assertion of liability based on Dr. Barke's professional knowledge, as a physician, of his patient's condition, which requires consideration of certain complex medical factors including an alleged history of dizzy spells due to diabetes. Certainly, the issues implicate Dr. Barke's medical judgment with regard to Mrs. Dudley's condition.

¶ 22 Accordingly, we further conclude that these medical issues would require expert testimony from a qualified witness to explain to the jury the impact of Mrs. Dudley's medical condition on her ability to stay safely seated on an examination table in preparation for the suture removal procedure. In other words, in the instant case, based on the cause of action as pled by Plaintiff in her complaint, "the matter under investigation" is not so simple, and the want of care is not so obvious "as to be within the range of the ordinary experience and comprehension of even nonprofessional persons." *Chandler v. Cook,* 265 A.2d at 796 n. 1. Moreover, because of the medical issues involved and the question of how a physician should act when presented with a patient with such issues, expert testimony was required with regard to causation because there is no "obvious causal relationship" between the injury and the alleged negligence, *i.e.,* the injuries are neither an "immediate and direct" or the "natural and probable" result of the alleged negligent act. *Lattanze,* 448 A.2d at 608.

¶ 23 Finally, in presenting its theory of liability as medical malpractice requiring expert testimony, it was necessary for

Plaintiff to present an expert who would testify to a *reasonable degree of medical certainty* that Dr. Barke's alleged acts or omissions deviated from the applicable standard of care and that such deviation was the proximate cause of Mrs. Dudley's injuries. *See Joyce v. Boulevard Physical Therapy & Rehab. Ctr., P.C.,* 694 A.2d 648, 653–54 n. 3 (Pa.Super.1997). Plaintiff failed to carry her burden of presenting expert testimony meeting the reasonable degree of medical certainty standard. In his expert report, Dr. Bayer concluded as follows:

> Based on review of all records provided, it is my medical opinion to a reasonable degree of certainty that Ms. Dudley sustained a hip fracture in Dr. James Barke's office on April 20th, 1998. This was a result of a negligent act by Dr. Barke and/or his staff and/or clinic concerning patient safety. Whereby Ms. Dudley was requested to perform an act but left unattended and unassisted resulting in an accident causing a hip fracture [sic]. This case represents general liability with a negligent act of omission.

Expert Report of Jay Bayer, D.O., at ¶ IV. However, Dr. Bayer also stated in his report:

> [T]he situation involves [g]eneral liability and patient safety, ***not malpractice or inappropriate medical care.*** The negligent act in this case was requesting a patient of this size (about 300 lbs) and age (about 68), with multiple complex medical problems to sit upon an examination table that is higher than a chair ... To leave such a patient ... alone in the examination room unattended to perform this task, creates concern for important patient safety issues of all ages. Particularly the elderly [sic]. Good safety rules of an office, clinic, or hospital are to assist the patient on and off of this type of examination table.

Unless very tall, the average patient must "[c]limb up" to get on and "climb down" to get off. Attendance for assistance may be the physician or anyone from the staff.

> The records indicate the physician performed an injudicious act or an act of poor judgment, by requesting Ms. Dudley to get on the table and leave her unattended without assistance. When attended, such patients may be aided if they get dizzy, feel faint, miss the foot step, or find it difficult to get on the step then maneuver in to position to sit, etc. In this case, the negligent allowed [sic] Ms. Dudley to fall and break her hip. With safety in mind and assistance with attendance, Ms. Dudley may have passed out but the probability of a fractured hip would have been significantly reduced.

*Id.* at ¶ III (emphasis added). Dr. Bayer essentially reiterated the same opinion at his deposition.

¶ 24 We realize that "no magic words are required to demonstrate causation; the reasonable degree of medical certainty essential for acceptance of an expert's opinion must be amenable to extrapolation from the expert's report." *Watkins v. Hospital of the Univ. of Pa.,* 737 A.2d 263, 267 (Pa.Super.1999). Rather, "[w]hat the expert must demonstrate is that the negligence of the defendant either proximately caused the plaintiff's harm, or increased the risk of its occurrence." *Id.* With this in mind, we hold that the trial court did not err by concluding that Dr. Bayer did not state that, with the requisite degree of medical certainty, Dr. Barke's alleged negligence proximately caused Mrs. Dudley's injuries in the context of the medical malpractice cause of action pled by Plaintiff. Without such expert testimony, Plaintiff could not establish its *prima facie* case of medical negligence and, accordingly, the trial court did not err by granting summary judgment in favor of Dr. Barke.

¶ 25 Moreover, based on our reading of the complaint in this case, we conclude that a claim of ordinary negligence cannot be subsumed within the medical malpractice claim. We examined the complaint and discerned Plaintiff's theory of liability, as it is the court's responsibility to do. *See Bartanus*, 480 A.2d at 1182. As we concluded above, Plaintiff's theory was one of medical malpractice, as its claims were predicated on factors such as the physician-patient relationship, etc., all outlined above. Ordinary negligence was not pled in the complaint and, so, it is not a theory of liability the court should consider. This point is well-illustrated by the following analogy. Suppose, for example, Plaintiff had pled a cause of action sounding in premises liability, which is also a type of negligence claim. In such a case, the court would not expect the Plaintiff to proceed on a medical malpractice theory, *i.e.*, a different "type" of negligence claim. *See, e.g., Estate of Swift*, 690 A.2d at 723 (stating that plaintiff pled facts establishing that decedent was a business invitee on hospital premises when she incurred injuries sustained in slip-and-fall accident in hospital restroom and, therefore, plaintiff's complaint sounded in premises liability—court would not then consider any assertion of hospital malpractice because complaint was "completely devoid of any reference to a cause of action for hospital malpractice").

¶ 26 A cause of action sounding in ordinary negligence was not pled in the instant case; Plaintiff presented only a cause of action sounding in medical malpractice. Accordingly, it was proper for the trial court to assess this case pursuant to principles of medical malpractice rather than ordinary negligence, thereby requiring Plaintiff's expert to testify to a reasonable degree of medical certainty. Since Plaintiff's expert failed to do so, we must affirm the trial court's grant of summary judgment in favor of Dr. Barke.

¶ 27 Judgment affirmed.

¶ 28 Judge JOYCE files a dissenting opinion.

### DISSENTING OPINION BY JOYCE, J.:

¶ 1 While I agree with the esteemed Majority's conclusion that Appellant's claim sounds in medical malpractice, not ordinary negligence, I do not agree that Appellant has failed to establish the requisite elements of a medical malpractice claim. Accordingly, I dissent.

¶ 2 The Majority states that Appellant has failed to demonstrate, via its expert witness, that "Dr. Barke's alleged acts or omissions deviated from the applicable standard of care and that such deviation was the proximate cause of Mrs. Dudley's injuries." Majority's Opinion, at 572. Nevertheless, a review of Dr. Bayer's expert report reveals that Dr. Bayer did opine, to a reasonable degree of medical certainty, that Appellee acted below the standard of care and that Appellee's deviation from the standard of care caused Mrs. Dudley's injuries. In Dr. Bayer's report, he states that, at the time of her fall, Mrs. Dudley was sixty-eight years old and weighed approximately three hundred pounds. Dr. Bayer also indicates that Mrs. Dudley suffered from a number of health conditions including diabetes, hypertension, morbid obesity, diabetic neuropathy, anemia and cardiovascular disease. In view of Appellant's physical characteristics and medical problems, Dr. Bayer opined that Appellee acted "negligently" by asking Mrs. Dudley to climb up on an examination table and to remain seated on the table while unattended. He further stated that "[g]ood safety rules of an office, clinic, or hospital are to assist the patient on and off this type of examination table." Dr. Bayer also opined, to a reason-

able degree of medical certainty, that Mrs. Dudley sustained injury (*i.e.* a hip fracture) as a result of Appellee's negligent act.

¶ 3 The Majority appears to find the expert report inadequate, however, because Dr. Bayer also states that the instant situation "involves general liability and patient safety, not malpractice and inappropriate care." *See* Majority's Opinion, at 572. By highlighting this portion of the report, the Majority suggests that an expert report will not suffice unless the expert explicitly characterizes the physician's actions as malpractice. I reject this approach because it places an improper emphasis on an expert's utilization of "magic words" and because it ignores the thrust of Dr. Bayer's opinion, namely, that (1) Appellee acted negligently when he ordered a woman in Mrs. Dudley's condition to sit unattended on a table and (2) this negligence caused Mrs. Dudley's injuries.

¶ 4 Furthermore, the actual meaning of Dr. Bayer's statement that the instant case does not involve "malpractice or inappropriate medical care" becomes apparent upon a review of Dr. Bayer's deposition. During his deposition, Dr. Bayer echoed the substance of his report, namely, that Appellee deviated from the standard of care and that this deviation caused Mrs. Dudley's injuries. Dr. Bayer also explained that he hesitated to label Appellee's conduct as "malpractice" because he thought that malpractice only occurred in instances where a physician did not provide the proper treatment for his/her patient's medical condition. He also stated that he did not deem Appellee's conduct "inappropriate medical care" because inappropriate medical care would only occur when the physician does not listen to his/her patient or "pursue certain complaints that may be important." Dr. Bayer's Deposition, at 102. As the Majority indicates, medical malpractice involves a much larger class of cases than those involving improper treatment, failure to listen, or failure to investigate. Rather, the Majority emphasizes that medical malpractice involves any claim (1) pertaining to an action that occurred during a professional relationship and (2) raising questions of medical judgment beyond common knowledge and experience. Majority's Opinion, at 570. Because Dr. Bayer did not recognize malpractice to encompass such a large variety of claims, he did not specifically characterize Appellee's actions as malpractice. I would not find Dr. Bayer's misunderstanding of the legal term "malpractice" fatal since the underlying substance of the report itself satisfy the elements of a malpractice claim.

¶ 5 Viewing the record in the light most favorable to the non-moving party, herein Mrs. Dudley's Estate, I find that the trial court abused its discretion when it concluded that Appellant could not establish a medical malpractice claim as a matter of law. Therefore, I dissent.