Cynthia N. PAPACH, Administratrix
of the Estate of Christopher K.
Haws, Deceased, Appellant

v.

MERCY SUBURBAN HOSPITAL, Kevin M. McAveney, D.O., Dr. John Doe, Cedar Management Corporation t/a Mercy Health Care System, L. Wimal Perera, M.D., Edward Schrieber, D.O., Jeffrey Brand, D.O., Suburban General Radiology Associates, P.C., David Bolden, D.O., and Frank DuPont, III, M.D. Appellees.

Superior Court of Pennsylvania.

Argued April 27, 2005.

Filed Oct. 12, 2005.

Reargument Denied Dec. 21, 2005.

**234**

Clifford E. Haines, Philadelphia, for appellant.

Deborah M. Knight, Philadelphia, for Brand, appellee.

Robert G. Yosua, Broomall, for Schrieber, appellee.

Paulyne A. Gardner, Norristown, for Mercy Suburban.

Before: LALLY–GREEN, PANELLA, JJ., and McEWEN, P.J.E.

McEWEN, P.J.E.:

¶ 1 This appeal has been taken from the judgment entered in this medical malpractice action on the jury verdict which absolved the then remaining defendants, appellees Mercy Suburban Hospital, Edward F. Schrieber, D.O., Kevin McAveney, D.O., and Frank DuPont, III, M.D., of any negligence in connection with the death of Christopher Haws. Appellant, the mother of Christopher Haws, contends in this appeal that a new trial is required due to the admission of prejudicial hearsay, and that the new trial should include Jeffrey Brand, D.O., as a defendant since his motion for summary judgment was improperly granted by the trial court. While we find summary judgment was properly entered in favor of Dr. Brand, we agree with appellant that the trial court erred when it overruled certain objections to the use of an EMS report. As a result, we vacate the judgment entered in favor of all appel-

lees, except Jeffrey Brand, D.O., and remand for trial as to appellees Mercy Suburban Hospital, Edward F. Schrieber, D.O., Kevin M. McAveney, D.O., and Frank DuPont, III, M.D.

¶ 2 The events immediately preceding the untimely death of Christopher Haws on August 23, 1999, were described at trial by Mark Thompson who had accompanied Christopher on a motorcycle ride on an unpaved trail along high tension line towers on the evening of August 19, 1999:

[BY MR. HAINES:]

Q. Well, let me get to it. August 19th, were you with Chris on that night?

A. Yes.

Q. And had the two of you ridden together the night before that?

A. Yes, we had.

Q. Mr. Thompson, were you with Chris on the 6th [of August] when he was riding?

A. No, I was not.

Q. Did you ride with him between [August] the 6th and the 18th?

A. No, we did not.

Q. Do you know why? I mean was there a particular reason that you were not riding at that point?

A. Well, because of the time from his first incident, you know, we were allotted a few weeks not to ride, so we abstained from riding.

Q. Keep your voice up, Mr. Thompson.

A. I'm sorry. We stopped. We didn't ride for that period of time just because of his previous injury.

* * * *

Q. When did you first learn about the accident of the 6th?

A. When Cindy and I returned home from Maryland she went into the house before I did and when I came back into the house she told me there was a message on the answering machine that Chris had been in an accident. To the best of my recollection, that's how it went.

Q. Okay. Did you and Chris ever discuss that accident, that first accident on the 6th?

A. Yes, we did.

Q. Did Chris describe to you what had happened?

A. Yes, he did.

Q. What did he tell you happened?

THE WITNESS: Chris told me that he was riding one way on a trail and it was at a point of a fairly, like a hairpin, like a sharp turn back the other direction and another rider was coming that direction and that they just kind of met in the middle, just type of terrain didn't allow the evasive action and they collided.

* * * *

Q. The two of you went out on the 18th and then the 19th; is that right?

A. That's correct.

Q. Tell us where you went on the 18th, how long you rode, what you did.

A. On the 18th we got together basically to go out and get some fresh air. It was just pure relaxation kind of thing. That might sound kind of relax riding what it really was and we went to a local area that a local group of guys, friends of ours and his, get together and practice riding. I mean it's a practice area that we usually use.

Q. How long did you ride on the 18th?

A. We were only at that area for probably—from the time we got in to the time we left, 45 minutes maybe, but, actual riding time, it couldn't have been more than 20 minutes probably.

Q. Was there a particular reason that you only rode 20 minutes?

A. As a matter of fact, we were asked to leave that day. Somebody had complained about the noise or something and the owner came over and asked us to cut it short.

Q. Are you aware of anything, any incident involving Chris and his bike on the 18th, a fall, an accident, or anything like that?

A. On the 18th, no.

Q. Did you see the picture, were you able to see the picture of Chris this morning when we showed it in his gear?

A. In gear, yes.

Q. When you went riding on the 18th, was he dressed like that?

A. Absolutely.

Q. The 19th, you went riding again; is that right?

A. Yes, that's correct.

Q. Where did you go?

A. We went to another local spot where guys go to ride and down off of Conshohocken Road in I think it's Plymouth Township.

Q. What time was that?

A. Let's see, it was probably between 5:00 and 6 o'clock.

Q. Because it was a summer night -

A. It was after work, so it had to be after 5:00.

Q. What happened?

A. We got there, unloaded the bikes, and started riding a little bit. It wasn't a real big area, so it was a type of strip of power lines, so it's not real giant sprawling and wide area and it's a fairly good road except for the actual trail you're riding on, which is maybe ten or 15 feet wide at that time and we had only been riding at that point for, let's see, it was like not long at all, five, ten minutes, and the way that place is laid out is it's along power lines, so you can go along the power lines for a fairly long distance straight away and there are certain cuts back to where the parking lot is, what we call kind of home base, and you can cut back and shoot back down towards home base and he was ahead of me and he turned and I kept continued on forward and I took a larger loop than he did and when I came back around from my loop, just there at the parking lot, you known, you turn, you go back up again and around. When I came—you know, the terrain sort of comes down the elevation from the parking lot to where we were was maybe 20 feet, but it's a fairly long rise, so it's not like it's real steep or anything, but I went down and came back up and around and there on the side of the trail was Chris.

Q. Can you describe what you saw?

A. It was kind of strange the way he was laying there. He was laying flat on his face with his arms down at his side, palms up, and his head was turned to the right and the front tire of his motorcycle was in perfect line with him and the front tire of the motorcycle was just laid over his riding boot by maybe a foot and I stopped alongside of him and he was a terrible practical joker, I actually, you know, booted him in the foot and said, "Hey, come on, quit messing around," and when he didn't respond, that's when I, you know, I didn't know what to think, **so I got off my motorcycle and pulled his back, you know, dumped it back off to the side of him, and at that point he was—it was kind of like he was asleep, he was actually snoring, and I turned to see if, you know, for some reason turned around in the parking lot was another rider and I yelled to him, hey, go in my truck which was parked right there and get my cell phone and get up here**

and that's what he did and that's when I called 911.

Q. When you got—let me back up. When the two of you were riding, was there anybody else riding with you?

A. I wasn't aware that anybody else was there until—I honestly don't recall seeing the other guy's truck in the parking lot when he got there. I don't know when he got there. All I know is when I turned to go to my truck, I guess that's why I turned to go get my cell phone, he was there, but as far as on the actual terrain that we were on, we did not see another rider, no.

Q. You heard Kenny's testimony this morning about the 6th and there being a lot of riders going in opposite directions?

A. Yes.

Q. Was that the situation on the 19th?

A. No, sir. We were the only people that I've seen on that track. I didn't see anybody else but him and I.

Q. The place where you found Chris, you said the trail was overgrown?

A. On either side it was high grass, it was high grass.

Q. Is that what you meant by overgrown?

A. Yes, sir.

Q. Where he was, were there any obstacles there?

A. Obstacles?

Q. A tree, a big stone, a big jump?

A. Not in that immediate area, no.

Q. Close by anywhere?

A. Probably not within—I'd be guessing like 50, 60 feet.

Q. Did you notice any damage to Chris' bike?

A. No, I didn't.

Q. Did you look?

A. Not at that time I didn't, no. That wasn't really my concern after finding him there.

Q. When you found Chris, did he have his helmet on?

A. Yes, he did.

Q. All of his gear on?

A. Complete gear.

Q. I'm sorry?

A. He had every piece of gear you can imagine on.

Q. Okay.

* * * *

BY MR. HAINES:

Q. Mr. Thompson, I interrupted you. You described calling back to someone to call 911. What happened next?

A. I dialed 911. The other rider that brought me the telephone, I handed him the telephone. That was the first time that I had been at that location was on the 19th and so I wasn't real familiar how to tell the emergency personnel how to get where we were, so I handed the phone off to him and he gave him directions to get there and I stayed with Chris until the paramedics arrived and before they arrived Chris had started to have a—well, actually let's back up a minute. After—all right. Let me just back up just a minute. When the gentleman, the other rider was bringing my phone up the hill to me, I started to dial 911. At that point Chris came around.

Q. What do you mean came around?

A. He started to wake up.

Q. Okay.

A. So he said, well, hold on a minute, he's coming around, he's coming around, so I said okay, and I stopped with the 911 call. Chris sat up, and he kind of flailed his arm around a little bit. You could see his motor skills were out of whack somewhat because his arm just didn't bend right. He was trying to

undo his gloves. The gloves have like a big nylon strap that holds them on and he was having difficulty taking that glove off and so I asked him, "Chris, are you okay, do you need an ambulance?"

And he was not able to vocally tell me yes or no, he just kind of moaned a little bit and I asked him a second time after—at that point, rather, I helped him take his helmet off and I asked him again, "Chris, do you need an ambulance, are you okay," and at that point he raised his hand to his forehead and just let out a moan and he just laid back down and that to my knowledge was the last time I saw him conscious or that he was conscious period and so at that point I dialed 911 again and that's when I handed the phone to the guy to direct the emergency personnel in.

Shortly thereafter while we were waiting for the ambulance people to show up, Chris went into somewhat of a seizure.

Q. What do you mean he went into a seizure?

A. Well, he just started flailing around on the ground unconscious, and so I just basically got on top of him and held him still until the paramedics arrived.

Q. Why did you do that?

A. Because he was really thrashing around on the ground. His head was weaving and bobbing and he was having problems.

Q. You said you took his helmet off?

A. Yes, I did.

Q. **Did you see any evidence of any cut or bruise on him anywhere?**

A. **No, not at that time.**

Q. **Did you notice anything torn or ripped about his clothes?**

A. **No.**

Q. **Did you observe anything that would explain or suggest what had happened?**

A. **To this day I can't explain what happened. I've been over it a hundred times in my head, I've been back to the site numerous times and I just can't explain why he was down in that location the way he was laid out. I can't explain it.**

(emphasis supplied).

¶ 3 Thirteen days prior to the events of August 19, 1999, on August 6, 1999, Christopher had sustained a head injury while riding his motorcycle and had visited the emergency room of appellee Mercy Suburban Hospital. Appellant has summarized the trial testimony concerning the events of August 6, 1999, in her brief as follows:

Twelve [sic] days before the events of August 19, Christopher had been involved in a violent collision while riding his motorcycle at a different location. According to the hospital records from Mercy Suburban, he and another rider had collided, resulting in Christopher striking his head in some way. Rendered unconscious and noticeably woozy and nauseous, Christopher's father, who had earlier been with him while he was riding, urged that they go to the hospital.

Somewhere around 10:20 p.m. on August 6, 1999, Christopher was seen in the emergency room of Mercy Suburban Hospital in Norristown, Pennsylvania with continuing complaints of headache, wooziness and lethargy. He told nurses on admission that he had had an accident, struck his head, been unconscious for three to five minutes, and had had one episode of vomiting. Dr. Kevin McAveney, D.O., who first saw Christopher, recognized his symptoms as consistent with the head injury he had suf-

fered earlier that day and ordered a CT scan.

Unbeknownst to Dr. McAveney, the scan was not read at the hospital, but rather [was remotely read] by a radiologist [Dr. DuPont on] a computer at [his] home....

[A]fter Christopher's CT scan was performed and interpreted off-site as described above [by Dr. DuPont], Dr. McAveney advised Christopher that the scan was negative and discharged him from the hospital. Unbeknownst to Christopher, his father, or Dr. McAveney, Christopher had, in fact, suffered a subdural hematoma on the evening of August 6. [The next morning, the scan was re-read by Dr. DuPont at the hospital, and the error noted. Dr. DuPont then contacted Dr. Schrieber at the hospital who contacted Christopher and his mother by phone. Dr. Schrieber testified that he also contacted Dr. L. Wimal Perera and Dr. Brand, but both doctors testified that they had no recollection of any call from Dr. Schrieber.]

* * * *

According to Cynthia Papach, Christopher's mother, she was away the weekend of the accident and learned of it when she came home and had a phone message to call Mercy Suburban Hospital. When she returned that call on Sunday, August 8, an unidentified physician told her only that some shadow had been seen on the x-ray and there was nothing to worry about. She also testified that she was told that Christopher should probably stay off his bike for several weeks.

* * * *

At trial plaintiff presented evidence that the CT scan performed on August 6 and interpreted remotely by Dr. Frank DuPont, III, M.D., should have been interpreted as demonstrating the presence of a subdural hematoma when it was read remotely. Plaintiff's expert, Dr. Carlos Martinez, M.D., testified that Christopher's hematoma was one that should have been identified, even accepting that teleradiology has inherent limitations of interpretation and reported as a bleed on the brain before [Christopher] left the hospital to insure proper care and management of his injury.

* * * *

Dr. Stephen Levine, an expert neurologist, testified that the injury that Christopher suffered on August 6 was one that not only required follow-up, but also warranted Christopher abandoning his dirt-bike riding for a significant period of time. According to Dr. Levine, the events and injury that Christopher suffered on August 6 were causally related to the further injury that Christopher suffered on August 19 when he experienced either a reoccurrence, continuation or aggravation of his original injury. It was Dr. Levine's opinion that the original injury was causally related to [Christopher's] second injury and, ultimately, to Christopher's death.

While no one witnessed the prodromal second event of August 19, which immediately led to Christopher's death, Mark Thompson testified that he and Christopher had agreed to go riding at a practice area that evening after they were done with work. According to Mr. Thompson, it was only a few minutes after they had begun riding that Christopher got ahead of Mr. Thompson. Mr. Thompson explained that he came over a small rise along the trail they were using and saw Christopher lying in the path next to his bike. There was no one else on the trail with whom Christopher could have collided. There were no obstacles on or along the path to explain why Christopher may have fallen.

There was no evidence of any accident. The way in which Christopher was laying next to his bike was inconsistent with his being thrown from the bike or his losing control of the bike while it was moving. It appeared to Mr. Thompson that Christopher had stopped his bike and either lay down next to it or fallen from a standstill. There were no cuts or bruises that Mr. Thompson noticed and no damage to the bike or unusual marks on it. According to Mr. Thompson, Christopher appeared to be either unconscious or semiconscious when he found him. Mr. Thompson was able to arouse Christopher briefly, only to have him lapse into unconsciousness and begin to shake violently as if he were suffering a seizure. Christopher appeared to be having difficulty breathing. [T]he first people to attend to Christopher were members of an ambulance crew from Plymouth Community Ambulance. Mark Thompson testified to their presence, but there was no identification before or at trial as to who any of the individuals associated with the company were, what experience, if any, they had with the emergency they faced, or what training they had in emergency medical care. A [typed EMS form] report offered at trial, contains only a description of what occurred in some sort of chronology and a narrative statement prepared without the name of any of the individuals who were part of the crew or the person making the report. There is nothing identifying the author of the document or providing any information about anyone who was at the scene or involved with attending to Christopher. The description of the scene, the events that transpired, and Christopher's condition that is contained in the "ambulance report" is widely different from any other description provided by Mr. Thompson in his trial testimony or in the subsequent medical records from the Hospital of the University of Pennsylvania. In addition to containing a description of Christopher that is wholly inconsistent with those prepared by any of the medical personnel from the hospital, the written chronology from Plymouth Community Ambulance indicates that they found Chris having difficulty breathing, but were unable to perform even the fundamental task of intubation. It was only after the arrival of a medevac helicopter from the Hospital of the University of Pennsylvania that the doctors who apparently were a part of that team were able to quickly intubate Christopher to assist his breathing. That fact alone suggests that no experienced medical person was a part of the ambulance crew.

¶ 4 At the Hospital of the University of Pennsylvania, a CT scan revealed the presence of a subdural hematoma as well as massive swelling of the brain, causing herniation of the brain. Grant P. Sinson, M.D., a neurosurgeon at the Hospital of the University of Pennsylvania, immediately took Christopher to surgery to relieve the pressure on his brain. Appellees contended at trial that there were two separate hematomas, a small, resolving hematoma resulting from the accident of August 6 and a new one from August 19, and argued that the swelling was not related to the hematomas but rather to a recent, forceful blow to the side of Christopher's head.

¶ 5 At trial, the main theory of the defense was that Christopher had sustained a serious injury on August 19th, wholly unrelated to the injury sustained on August 6th, and died as a result of massive edema of the brain which occurred on August 19th. Appellees made extensive use at trial of the EMS report to establish that Christopher had "crashed" his motorcycle

on August 19th rather than, as argued by appellant, laying it down due to symptoms he was experiencing related to his subdural hematoma.

¶ 6 Appellant presented expert testimony from Dr. Steven Levine, Dr. Gregory Jay, and Dr. Carlos Martinez at trial. Dr. Levine testified that the failure to order a repeat CT scan once the hematoma had been identified the next morning by the on-site radiologist constituted negligence. Dr. Levine also testified that Christopher should have been admitted to the hospital on August 6 for observation in light of his symptoms.

¶ 7 Dr. Levine testified that once the subdural hematoma had been diagnosed, Christopher should have been told to return to the hospital to be seen by a neurosurgeon and that the instruction to obtain follow-up care from his family doctor was below the applicable standard of care.

¶ 8 Dr. Martinez, a neuroradiologist, testified that the CT scan performed on August 6, 1999, clearly showed the subdural hematoma and that it was below the standard of care for the radiologist to fail to immediately identify the subdural hematoma.

¶ 9 Appellee, Dr. Schrieber, testified that immediately upon being notified by Dr. DuPont on August 7 that the remote CT report had been incorrect, he contacted Christopher, Christopher's mother, Dr. Perera, and Dr. Brand.

¶ 10 Dr. L. Wimal Perera and Dr. Jeffrey Brand both denied any memory of receiving a telephone call from Dr. Schrieber, who testified at trial that he had placed calls to each of them on August 7, 1999, after being advised of the revised diagnosis for Christopher Haws.

¶ 11 Appellant released Dr. Perera from the action prior to trial but refused to release Dr. Brand as a defendant, despite this testimony, due to the possibility that the jury would accept Dr. Schrieber's testimony concerning his alleged call to Dr. Brand, and thus exonerate Dr. Schrieber.

### I. Admissibility of EMS Report

¶ 12 Appellant claims that the appellees' extensive use at trial of the six-page Plymouth Community Ambulance EMS Report, over the objections of appellant, requires the award of a new trial. The trial court originally sustained hearsay objections to introduction of the comments contained in the EMS report, but later in the trial overruled those same hearsay objections, resulting in the admission of all of the hearsay statements contained in the report.

¶ 13 Our standard of review of an evidentiary ruling made by the trial court is extremely narrow.

> "The admission or exclusion of evidence is a matter within the sound discretion of the trial court, which may only be reversed upon a showing of a manifest abuse of discretion." *Eichman v. McKeon,* 824 A.2d 305, 319 (Pa.Super.2003) (citation omitted). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Ettinger v. Triangle–Pacific Corp.,* 799 A.2d 95, 110 (Pa.Super.2002) (citation omitted).

*Potochnick v. Perry,* 861 A.2d 277, 282 (Pa.Super.2004). *Accord: Antoniotti v. Eckels,* 840 A.2d 1013, 1015–1016 (Pa.Super.2003).

¶ 14 The trial court, in the 1925(b) opinion written for the benefit of this Court in connection with this appeal, explained:

> There are several reasons which sanction the use of the ambulance report in this case. Initially it must be noted that it was undisputed by the par-

ties that the plaintiff's decedent was treated at the scene of the second accident by the Plymouth Community Ambulance. The records containing the treatment of Mr. Haws were made in the regular course of business, were obtained by the defendant's use of a subpoena and were self-authenticated. Pursuant to the provisions of the Pennsylvania Rules of Evidence (901 and 902) the properly obtained ambulance records were certified as required. The self-authenticated ambulance records were therefore appropriately admitted as evidence pursuant to Pa.R.E. 803(6) .... The ambulance records were also admissible pursuant to the holding in *Gunn v. Grossman,* 748 A.2d 1235 (Pa.Super.2000) which states that:

> It is well-settled in Pennsylvania that a medical expert is permitted to express an opinion which is based, in part, on medical records which are not in evidence, but which are customarily relied on by experts in her profession. *Cohen v. Albert Einstein Medical Center,* 405 Pa.Super. 392, 592 A.2d 720 (1991). This exception to the rule against hearsay was adopted in Pennsylvania law in 1971 in *Commonwealth v. Thomas,* 444 Pa. 436, 282 A.2d 693 (1971), and has been applied consistently since then. *See Primavera [v. Celotex Corp.,* 415 Pa.Super. 41, 608 A.2d 515]. [Moreover,] while the fact that a testifying expert may have based her opinion, in part, on the diagnoses and opinions of other experts may impact the weight the jury assigns to her ultimate opinion, this fact alone does not require exclusion. If the opinions expressed by other physicians are part of the type of material reasonably relied on by experts in the particular field, not only is disclosure of those opinions permissible, it is likely to be helpful to the jury in assisting it in evaluating the testifying expert's opinion. Therefore, there is no basis in reason or case law to exclude opinions or diagnosis which are reasonably and traditionally relied upon by experts. *Primavera,* 608 A.2d at 523.

748 A.2d 1235 at 1241–1242.

> In the instant case, although the ambulance records had not been admitted into evidence at the time they were used during the cross-examination of the plaintiff's expert witness and during the direct examination of the defendant's expert witness, the use of the same complied with the mandates of *Gunn, supra.* The plaintiff's motions for a new trial based upon the claims relating to the ambulance report were therefore denied.

We find ourselves unable to agree with the learned trial court that the EMS report was admissible as an exception to the prohibition against hearsay.

¶ 15 The EMS form contains the following recitation of the events of August 19th:

> Scene: Arrived to find 24 yoa male, approx. 90 Kg., lying supine at top of hill with motorcycle lying in front of pt near pt.s right leg. PD and bystanders on scene with pt. Noted that pt did not have a helmet on upon EMS arriving at the scene.

> Primary: Pt unresponsive, ABC's beginning to compromise/distress noted; pt. has aginal respirations 8–10 minute, pt still has good color.

> **HPI: Friend of pt. was riding in front of him when he heard a crash behind him. Friend then turned his bike around to see his friend lying at the**

top of the hill motionless. Pt.s friend then went for help. Pt. was riding his dirt bike behind some bldg.s in the industrial park at this location when somehow he lost control of the bike but there is no witness to tell exactly what happened or what caused the accident.

PE:

Neuro: Upon arrival pt was unconscious, not alert with GCS = 3. Pt. had not response to painful or verbal stimuli. (+) Loss of Consciousness, (−) CSF, (−) Bleeding from HEENT, (Eyes =) Both pupils completely dilated to 8mm, (+) seizure activity noted, upon EMS arrival, pt.s arms, legs and face tightened with jerking movements, also PD [police department] stated prior to their arrival pt had some type of seizure activity. (+) Mobility to all extremities, during seizure activity only (−) Grip strength to hands.

CV: (−) Chest Deformity/Crepidus, (+) JVD, slight (+) Diaphoresis, (+) Pulses in all extremities; regular, Capillary Refill < 2 Seconds, (−) Ectopy on monitor, Interpretation = Sinus Bradycardia initially at 58 BPM, upon arrival in ambulance pulse rate up to approx. 160 BPM no ectopy, and upon transfer to flight team back to 80 BPM at all times with radial pulses.

Resp: (+) Dyspnea, (Trach) Slightly deviated (−) Cyanosis, (+) Spontaneous Respirations, as noted in flow chart, pt having agnial respirations, (=) Chest Expansion, (−) Pulmonary Edema, (+) Accessory muscle use; Symmetrical, LS = Rales in bases.

MS: Obvious Trauma noted to head and abdominal region. (−) Limb Deformity, (+) Limb Injury, right hand lacerations, noted bruising to right arm. (−) Pedal Edema.

SKELETAL—Skull and facial bones intact, no deformity. Thoracic bones intact, no deformity. Pelvis stable, no deformity. Long bones intact, no deformity. Spine inline, no deformity.

GI: Abd(+) Rigidity noted up on initial survey, no bruising noted to the area. (−) Palpable or Pulsating masses, (−) Guarding, (−) Incontinence, (+) Vomiting of bright red frothy blood upon arrival in ambulance.

Skin: Warm and Dry, Good Turgor, Normal Pallor.

Tx: Upon arrival assessed pt with vitals taken as noted in flow chart. Lung Sounds found to have rales in the bases. Noted that pt. had aginal respirations and both pupils were fixed and dilated at 8mm. Pt. was also having seizure like activity upon EMS arrival. Monitor applied with above interpretations noted. C–Spine immediately stabilized and No-neck C-collar applied to pt. Second 308 unit arrived on scene to assist 308–1. **Pt.s friend stated that he was wearing a helmet prior to accident but after looking around EMS could not find the helmet and it was off the pt. prior to EMS arrival.**

Attempt was made to visualize for possible intubation but pt. was clamped down and crew was unable to open airway. Pt. still breathing on his own at 8–10 resp. per minute. Pt. then assisted with BVM & 02 at 15 LPM. Asst. 308 went back to ambulance to receive orders from Dr. Pulley at Montgomery to fly pt. to trauma center.

IV established with 16G angio in RACF, with NSS run wide. Pt. then moved to longboard with CID & straps, secured and moved to ambulance.

Upon arrival in ambulance pt. continually assisted with ventilations by BVM & 02. Pt. began to vomit bright, red frothy blood and was suctioned immediate-

ly. Approx. 600–800 cc's of blood suctioned from pt. to clear airway.

Pt began to have seizure activity again and was given 5 mg of Valium, IV push. After pt. was suctioned, pt was Hyperventilated with BVM and 02 before ET attempt made.. Pt. exposed to look for further injuries, but did not find bruising or deformity to chest or abdomen. Abdomen still rigid upon palpation. After approx. 1 min. of drug administration pt.s seizure activity stopped and his jaw became unclenched....

Flight crew entered ambulance and was given report of pt. assessment, pt condition and treatment rendered. Pt. intubated with 7.5 ET that measured 24 mm at the lips and was secured. IV attempt made with 16G in L–ACF, obtained flash but site infiltrated. Pt. was then suctioned again from ET tube obtaining approx. 300 cc's more frothy blood. IV attempt made with 16G, right ACF, unsuccessful. Pt. continually monitored and reassessed while waiting to transfer to flight crew for transport.

Pt transported class 1 to LZ at Fire Academy. Pt care transferred to Penn Star flight crew for transport back to HUP.

\* \* \* \*

JMZ–040981 [1]

Crew signatures:

(emphasis supplied throughout).

¶ 16 Despite the area designated for "crew signatures", no signatures of any kind are affixed to the report—nor are the members of the crew identified in the report by name.

¶ 17 The trial transcript clearly evidences that appellees sought and did on numerous occasions in the presentation of the defense utilize the EMS report to es-

tablish that Christopher was, on August 19, 1999, involved in a serious accident which resulted in trauma to his head, abdomen and hand which trauma resulted in his death. Thus, appellees sought to introduce the report as proof of the matter asserted therein, namely, that Christopher had sustained serious injuries to his head, abdomen and hand, in a motorcycle accident. Because the report itself was clearly hearsay, it could be properly introduced into evidence only if it was an exception to the hearsay rule. *See, e.g.:* Pa.R.E. 802; *Rox Coal Co. v. WCAB (Snizaski),* 570 Pa. 60, 74, 807 A.2d 906, 914 (2002); *Phillips v. Gerhart,* 801 A.2d 568, 574 (Pa.Super.2002); *Liles v. Balmer,* 389 Pa.Super. 451, 567 A.2d 691, 693 (1989). Appellees posit two arguments in support of their claim that the report was admissible.

### A. Pa.R.E. 803(6)

■ ¶ 18 Appellees first claim the report is admissible pursuant to Pa.R.E. 803(6). The EMS report was obtained by the appellees from the Plymouth Ambulance Corps pursuant to a subpoena. At trial, and in the appeal to this Court, appellees argue that the report was admissible pursuant to Pa.R.E. 803(6) **Records of Regularly Conducted Activity**, which provides:

A memorandum, report, record, or data compilation in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies

1. Appellees suggest in their brief that "JMZ–    040981" is the author of the EMS report.

with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Pa.R.E. 803(6).

¶ 19 The Comment to Pa.R.E. 803(6) recites that the Pennsylvania Rule is

similar to F.R.E. 803(6), but with two differences. One difference is that Pa. R.E. 803(6) does not include opinions and diagnoses. This is consistent with prior Pennsylvania case law. *See Williams v. McClain*, 513 Pa. 300, 520 A.2d 1374 (1987); *Commonwealth v. DiGiacomo*, 463 Pa. 449, 345 A.2d 605 (1975). The second difference is that Pa.R.E. 803(6) allows the court to exclude business records that would otherwise qualify for exception to the hearsay rule if the "sources of information or *other circumstances* indicate lack of trustworthiness." The Federal rule allows the court to do so only if "the source of information or *the method or circumstances of preparation* indicate lack of trustworthiness."

Rule 803(6) was amended in 2001 consistent with the December 1, 2000 amendments to F.R.E. 803(6) that permit records of regularly conducted activity to be authenticated by certification. This amendment is designed to save the expense and time consumption caused by calling needless foundation witnesses. The notice requirements provided in Pa. R.E. 902(11) and (12) will give other parties a full opportunity to test the adequacy of the foundation.

¶ 20 Appellees contend that the EMS report, made in the regular course of the ambulance service's business, qualified for admission into evidence under Rule 803(6), since the report was certified by the custodian of the records of the ambulance service pursuant to Pa.R.E. 902(11).

■ ¶ 21 The EMS report at issue is in many respects similar to a police accident report as it contains what appears to be both first-hand observations by members of the crew as well as statements obtained from individuals at the scene. Police accident reports are hearsay under Pennsylvania law, not admissible under Rule 803(6).

Pennsylvania Rule of Evidence 802 provides that hearsay is not admissible unless some exception applies. "A police report prepared by an officer who is not a witness to the accident is inadmissible hearsay evidence and should not be admitted into evidence. Nor should a party be able to get such a report into evidence in an indirect manner." *Holland v. Zelnick*, 329 Pa.Super. 469, 478 A.2d 885, 888 (Pa.Super.1984). *See Johnson v. Peoples Cab Co.*, 386 Pa. 513, 126 A.2d 720 (1956) (holding that a report of a police officer, who arrived at an accident some minutes after a collision, which contained a statement that one of the vehicles traveled through a stop sign, was inadmissible hearsay evidence); *accord Harvey v. Doliner*, 399 Pa. 356, 160 A.2d 562 (1960).

*Rox Coal Co. v. WCAB (Snizaski), supra* at 74–75, 807 A.2d at 914. *Accord: Haas v. Kasnot*, 371 Pa. 580, 586, 92 A.2d 171, 174 (1952) (police report inadmissible hearsay as the "description of the occurrence could have been obtained by the officers only from witnesses interviewed by them, and therefore was purely hearsay testimony.... In answer to defendant's contention that the report was admissible under the Uniform Business Records as Evidence Act ... it is sufficient to state ... 'the Act did not intend ... to make all business and professional records compe-

tent evidence regardless of by whom, in what manner, and for what purpose they were compiled or offered.' "); *Jennings v. Commonwealth, Dept. of Transportation*, 715 A.2d 552, 554 (Pa.Cmwlth.1998) ("There is no question that the police report, as an out of court statement offered to prove the truth of the matters asserted therein, constitutes hearsay.").

¶ 22 The argument of appellees that the report is admissible pursuant to Rule 803(6), because it was made in the regular course of business by the ambulance corps, overlooks the requirement:

> either (1) that the author of the document had personal knowledge of the matters reported, or (2) that the information he reported was transmitted by another person who had personal knowledge, acting in the course of a regularly conducted activity, or (3) that it was the author's regular practice to record information transmitted by persons who had personal knowledge.

*In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 288 (3rd Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *Accord: Coyle v. Kristjan Palusalu Maritime Co., Ltd.*, 83 F.Supp.2d 535 (E.D.Pa. 2000), *affirmed*, 254 F.3d 1077 (3d Cir. 2001). Rule 803(6) requires that all persons involved in the compilation of the data be acting in the course of a regularly conducted activity. Witnesses to and bystanders at accident scenes are not then engaged in the regular course of business.[2]

The justification for this exception [Rule 803(6)] is that business records have a high degree of accuracy because the nation's business demands it, because the records are customarily checked for correctness, and because record keepers are trained in habits of precision. McCormick, *Evidence*, § 306 at 720 (2d Ed. 1972). Double hearsay exists when a business record is prepared by one employee from information supplied by another employee. **If both the source and the records of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6). HOWEVER, IF THE SOURCE OF THE INFORMATION IS AN OUTSIDER, RULE 803(6) DOES NOT, BY ITSELF, PERMIT THE ADMISSION OF THE BUSINESS RECORD.** The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have. *See: United States v. Davis*, 571 F.2d 1354 (5th Cir.1978); 4 D. Louisell and C. Mueller, *Federal Evidence*, § 448 (1980); McCormick, *Evidence* § 310 at 725–726 (2d Ed. 1972); 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(6)[04] (1981).

*U.S. v. Baker*, 693 F.2d 183, 188 (D.C.Cir. 1982) (emphasis supplied).

¶ 23 While, as far as we can determine, no Pennsylvania appellate court has yet addressed this precise facet of the course of business requirement of Rule 803(6),[3]

---

**2.** The EMS report contains substantial double hearsay in the form of information obtained from unidentified individuals and reported but not observed by any members of the ambulance crew. It also appears that one or more police officers reported bystanders' comments to the ambulance attendants, resulting in a triple hearsay statements being included in the EMS report in addition to the double hearsay statements which purported to recite the acts of Mr. Thompson.

**3.** The Superior Court in *Commonwealth v. Carter*, 861 A.2d 957, 962–963 (Pa.Super.2004), *appeal granted*, 583 Pa. 678, 877

numerous federal courts have examined the requirement that all persons contributing information to the business record must be acting in the course and scope of their duties. *See, e.g.: Rowland v. American General Finance, Inc.,* 340 F.3d 187, 194–195 (4th Cir.2003); *Timberlake Construction Co. v. U.S. Fidelity & Guaranty Co.,* 71 F.3d 335, 342–343 (10th Cir.1995) ("If any person in the process is not acting in the regular course of business, then an essential link in the trustworthiness chain fails ...."). *See also:* F.R.E. 803(6) Advisory Committee's Notes.

¶ 24 Appellees rely upon the recent decision of this Court in *Folger v. Dugan,* 2005 PA Super 215, 876 A.2d 1049, 1055 (*en banc*), where an *en banc* panel of this Court held that medical records containing the results of a polymerase chain reaction test were admissible under Pa.R.E. 803(6) as the test results were "a matter of fact rather than of opinion." *Id.* at 1056. The *Folger* court explained that under the Pennsylvania Rules of Evidence: "Medical records are admissible under the hearsay rules as evidence of facts contained therein but not as evidence of medical opinion or diagnosis." *Id.* at 1055. *See: Comment to Pa.R.E. 803(6).*

¶ 25 The record in *Folger* however, unlike the record at issue herein, was created by a medical professional in the course and scope of his/her work, based on information communicated to him/her by another medical professional acting within the course and scope of his/her work. Thus, the facts contained in the record were admissible under Pa.R.E. 803(6).

¶ 26 The Plymouth Ambulance EMS report, however, was clearly cobbled from information provided by bystanders not engaged in the course and scope of the business which compiled the report, the Plymouth Ambulance Service, as well as from the personal observations of the members of the ambulance crew. Thus, the report is more akin to the emergency room record at issue in *Isaacson v. Mobil Propane Corp.,* 315 Pa.Super. 42, 461 A.2d 625 (1983), a case cited with approval by this Court in *Folger.* In ruling the emergency room report inadmissible under both Pennsylvania decisional law and Federal Rule of Evidence 803(6), this Court in *Isaacson* explained:

> Mobil Propane argues that there is a genuine issue of material fact as to whether a City fire truck ran over Selma Isaacson's legs after the explosion. In support of this argument Mobil Propane produced a hospital emergency room record of Selma Isaacson's admission. According to Mobil Propane this emergency room record states:
>
> > patient was in a garage when a propane gas tank exploded causing a cinderblock wall to fall on her lower back. While unconscious a fire truck ran over her, the tires running over her thighs. She was then brought to the ER with numerous fractures ...
>
> The lower court granted summary judgment in the City's favor despite the existence of this history because the history "constitutes double hearsay (i.e. the original statement and its recordation in the history) that is irremediably inadmissible." Lower ct. op. at 13. Mobil

---

A.2d 459 (2005) (2005 Pa. Lexis 1360), held that a laboratory report detailing the presence of illegal drugs had been prepared in anticipation of litigation and thus was not a business record under Rule 803(6). The Commonwealth Court in *Centennial Station Condominium Assn. v. Schaefer Co. Builders,*

*Inc.,* 800 A.2d 379, 385–386 (Pa.Cmwlth. 2002) held, without discussion, that an 89 page packet of documents containing estimates and quotes from contractors was not admissible as a business record under Pa. R.E. 803(6).

Propane argues that the statement in the hospital record is admissible under the business records exception, the hearsay rule and Rule 803(6) of the Federal Rules of Evidence.

A medical report is admissible under the business records exception to the hearsay rule if the report: (1) was made contemporaneously with the events it purports to relate, (2) at the time the report was prepared, it was impossible to anticipate reasons which might arise in the future for making a false entry in the original, and (3) the person responsible for the statements contained in the report is known. *See, e.g., Sauro v. Shea*, 257 Pa.Super. 87, 99 n. 4, 390 A.2d 259, 265 n. 4 (1978). Mobil Propane argues that because the report in question was made shortly after the explosion by an emergency room physician who had no reason to falsify the report all of the requirements for admissibility are met.

On the other hand, the City contends that the record was not made contemporaneously with the events that took place after the explosion and that because of the delay in preparing the report it was possible to anticipate reasons why a false entry might be made. The city also argues that because the identity of the person responsible for making the recorded statement is unknown, the third element of the admissibility test is not satisfied.

\* \* \* \*

There is a complete absence of any such indicia of trustworthiness in this case for no one knows who supplied the information concerning the alleged incident to the treating physician. "The problem is, however, that no party to the action nor any other person responsible for the

hospital entries in question is known to have given the information on which the histories were based. *See Fauceglia v. Harry*, 409 Pa. 155, 185 A.2d 598 (1962)." *Incollingo v. Ewing*, 444 Pa. 263, 279, 282 A.2d 206, 215 (1971).

... Mobil Propane seeks to use the statement from the hospital record to show that there is a genuine issue of material fact, i.e., that a fire truck ran over Selma Isaacson's legs. Therefore, the lower court correctly decided that the statement was inadmissible.[2]

---

[2] According to Mobil Propane the statement in the hospital record also qualifies for admission under Rule 803(6) of the Federal Rules of Evidence .... In the case at bar the requirements of the Federal Rule are not met. The identity of the individual who gave the emergency room physician the recorded information is not known, and thus there is no way to determine whether the report contains "information transmitted by, a person with knowledge," nor to determine the trustworthiness of the source of information. Federal Rule of Evidence 803(6) does not, therefore, make the hospital record admissible.

*Isaacson v. Mobil Propane Corp., supra,* 461 A.2d at 629–630 (footnote 1 omitted).

¶ 27 Thus, we have no hesitation in concluding that the EMS report was not admissible under Pa. R.E. 803(6), as the statements at issue were provided by individuals who were not acting in the course of their employment.

## B. Use of Medical Records Not in Evidence.

■ Appellees also argue in the brief submitted in this appeal that

Every expert ... reviewed [4] the ambulance report when they formed their opinions in this case. The fact that the defense expert did not testify that these are the type of records reasonably relied

---

4. Appellees' argument suggests that the word "reviewed" is synonymous with the word "re-

lied." We are not persuaded of the merit of this assumption.

on elevates form over substance. To suggest that medical experts in medical malpractice cases do not rely on medical records in forming their opinions is absurd.

■ It is well-settled in Pennsylvania that a medical expert may not merely repeat another's conclusion, but is permitted to express opinions based, in part, upon reports of others which are not in evidence but which the expert customarily relies upon in the practice of his profession. *Collins v. Cooper*, 746 A.2d 615 (Pa.Super.2000). The application of this rule "depends on the circumstances of each particular case and demands the exercise of the trial court's sound discretion." *Id.* at 618. With regard to the statements at issue here, "[w]e recognize that a physician will often base his diagnosis on information obtained through other sources such as statements from patients, nurses' reports, hospital records, and laboratory tests. The fact that experts reasonably and regularly rely on this type of information to practice their profession lends strong indicia of reliability to source material, when it is presented through a qualified expert's eyes." *Woodard v. Chatterjee*, 827 A.2d 433, 444 (Pa.Super.2003) (citations omitted). Moreover, the record reflects that all medical experts, both for Appellant and Appellee, considered these documents in the formulation of their opinions, and they did not merely parrot the findings or statements therein. As such, we find no abuse of discretion by the trial court in permitting these documents **to be considered by the expert witnesses.**

*Carroll v. Avallone*, 869 A.2d 522, 527–528 (Pa.Super.2005) (emphasis supplied). We have not discovered any cases discussing ambulance reports as medical records nor did any of appellees' experts testify that

they regularly and reasonably rely on descriptions of accidents contained in ambulance reports in the practice of medicine. Moreover, appellant is not challenging the consideration of the ambulance report by appellees' experts. Rather, she challenged the repeated use of the hearsay description of the events of August 19 contained in the EMS report. Courts regularly permit experts to express opinions reached in part as a result of their consideration of *opinions* contained in medical records, because such a practice is in accord with the actual, daily practice of medicine. This rule, however, does not operate to render a hearsay opinion contained in the medical record independently admissible. In fact, the appellate courts have repeatedly admonished that "a medical expert **may not merely repeat** another's conclusion but is permitted to express opinions based, in part, upon **reports of others which are not in evidence but which the expert customarily relies ·upon in the practice of his profession.**" *Carroll v. Avallone, supra*, 869 A.2d at 527 (emphasis supplied). Thus, we are not persuaded that the admission into evidence of the EMS report could be justified by reliance upon that line of cases which permits a testifying expert to rely, in part, on hearsay opinions contained in medical records not introduced into evidence. *See: Boucher v. Pennsylvania Hospital*, 831 A.2d 623, 628 (Pa.Super.2003), *appeal denied*, 577 Pa. 705, 847 A.2d 1276 (2004). *Cf: Daniel v. William R. Drach Co., Inc.*, 849 A.2d 1265, 1273 n. 3 (Pa.Super.2004).

\*

¶ 28 We are, therefore, compelled to award appellant a new trial as to Mercy Suburban Hospital, Edward Schrieber, D.O., Kevin M. McAveney, D.O., and Frank DuPont, III, M.D., as our review of

the record provides no basis upon which to conclude that the error was harmless.[5]

## II. SUMMARY JUDGMENT IN FAVOR OF JEFFREY BRAND, D.O.

¶ 29 Appellee, Jeffrey Brand, D.O., filed a motion for summary judgment based on the failure of appellant to produce an expert opinion setting forth the applicable standard of care breached by Dr. Brand, who, as Christopher's family physician, was allegedly requested to follow up with Christopher after the hematoma was discovered as a result of the review of the CT scan on August 7th.

¶ 30 Dr. Schrieber testified at his deposition that after being informed that the CT scan had been improperly reported to Christopher as normal, he placed a call to Dr. Brand, who was listed on the hospital records as Christopher's family physician, and

> explained to him that Chris had been in a motorcycle accident, he had had a concussion, he had been unconscious, for a period of time, and that he had been discharged from the emergency room and that I had received a phone call from Dr. DuPont reporting a possible abnormal CT scan. I explained that Chris would need another CT scan and

that he would need to be rechecked. Dr. Brand indicated that he knew Chris and he would take care of the problem.

¶ 31 Dr. Brand, however, testified in his deposition that Christopher had not had occasion to visit his office for five years prior to August 7, 1999, and that he had no recollection of every receiving a call from Dr. Schrieber.

¶ 32 Appellant produced expert opinions from a radiologist, Dr. Martinez, an emergency medicine specialist, Dr. Jay, and a neurologist, Dr. Levine. Appellant, however, never obtained an expert opinion that Dr. Brand's conduct was a violation of the standard of care applicable to a family practitioner, even after Dr. Brand filed a motion for summary judgment based on the absence of the required expert opinion.

¶ 33 Appellant failed to file such an expert report in response to Dr. Brand's motion for summary judgment despite the well-settled law of Pennsylvania that "a plaintiff must present medical expert testimony to establish that the care and treatment of the plaintiff by the defendant fell short of the required standard of care and that the breach proximately caused the plaintiff's injury." *Toogood v. Rogal*, 573 Pa. 245, 254–255, 824 A.2d 1140, 1145 (2003). On appeal, appellant argues

---

5. While the author of the dissenting memorandum, in her always perceptive fashion, concludes that appellant has waived her claim that the trial court committed reversible error, I am unable to apply the principles of waiver since

- Appellant ordered and the trial court received copies of the transcript of the entire trial.
- Rules 1911(a), 1922(a) and 1931(a), (b) and (c) of the Rules of Appellate Procedure require the appellant to request and pay for a transcript of the proceedings, and the court reporter to "lodge the transcript with the clerk of the trial court," while directing that the clerk of the court

"shall transmit" the complete record to the prothonotary of this Court.

- Appellant took the action required for the preparation of the transcript, and any failure to transmit that transcript may be traced to the court system. Thus, I am, very respectfully, of the view that to penalize an appellant for a breakdown in the operation of the court is inappropriate. *See also: Commonwealth v. Williams*, 552 Pa. 451, 458, 715 A.2d 1101, 1104 (1998) ("Although Rule 1911 requires appellants to order all transcripts necessary for their appeals, it does not place on appellant the burden to transmit the record to the Superior Court.").

that no expert opinion was required to establish professional negligence on the part of Dr. Brand if Dr. Schrieber had in fact advised him by phone of Christopher's need for follow-up. We are not persuaded of the merit of this argument.

¶ 34 This Court, in *Yee v. Roberts*, 2005 PA Super 240, 878 A.2d 906, in holding that a certificate of merit was required in an action against a professional corporation where the negligent acts were committed by a dental technician, noted:

> One of the most distinguishing features of a medical malpractice suit is, in most cases, the need for expert testimony, which may be necessary to elucidate complex medical issues to a jury of laypersons. In other words, "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons[,] a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury."

*Yee v. Roberts*, supra at 912, quoting *Grossman v. Barke*, 868 A.2d 561, 566 (Pa.Super.2005). An argument similar to that presented by appellant, namely, that expert medical testimony was unnecessary, was presented by the plaintiff in *Grossman v. Barke*, supra, as follows:

> "the facts clearly predicate liability on ordinary negligence notwithstanding the fact that the negligence occurred in the doctor's office and on an occasion where the plaintiff's decedent was at the doctor's office per a regular appointment with her 'family doctor' ...." Plaintiff further argued that Dr. Bayer's expert opinion and testimony supported a cause of action for ordinary negligence, *i.e.,* Dr. Bayer opined that Dr. Barke was aware of Mrs. Dudley's diabetes and associated dizzy spells and that asking

her to "jump on the table" without assistance constituted negligence and deviation from the standard of care in terms of patient safety. More specifically, Plaintiff argued that the complaint was sufficient to state a cause of action for ordinary negligence (which Plaintiff characterized as the "gravamen" of her complaint) because it averred that Dr. Barke was negligent in asking Mrs. Dudley to climb onto the examination table without assistance, that he allowed her to remain on the table unattended even though he knew that she was likely to lose her balance due to her diabetes and dizzy spells, and that he agreed to remove the sutures in her ankle without having the proper equipment immediately available.

*Grossman v. Barke, supra,* 868 A.2d at 565. This Court rejected the argument and held that the issues framed by the plaintiff's Complaint required "expert testimony from a qualified witness to explain to the jury that the impact of Mrs. Dudley's medical condition on her ability to stay safely seated on an examination table ... [and] expert testimony was required with regard to causation because there was no 'obvious causal relationship' between the injury and the alleged negligence ...." *Id.* at 571. *Accord: Toogood v. Rogal, supra,* 573 Pa. at 261, 824 A.2d at 1149.

¶ 35 In the instant case, the claim of negligence asserted against Dr. Brand did not involve a matter "so simple [or] lack of skill or want of care so obvious as to be within the range of the ordinary experience and comprehension of even nonprofessional persons." *Grossman v. Barke, supra,* 868 A.2d at 567 (citations omitted). Nor was there such "an obvious causal relationship", between Christopher's death and the alleged negligent act of Dr. Brand as to obviate the need for expert medical

testimony. *See: Grossman v. Barke, supra,* 868 A.2d at 571. Thus, the trial court properly granted summary judgment in favor of Dr. Brand based on the failure of appellant to produce an expert report.

¶ 36 Judgment in favor of Dr. Brand affirmed. Judgment against Mercy Suburban Hospital, Edward Schrieber, D.O., Kevin M. McAveney, D.O., and Frank DuPont, III, M.D. vacated. Case remanded for new trial against Mercy Suburban Hospital, Edward Schrieber, D.O., Kevin M. McAveney, D.O., and Frank DuPont, III, M.D. Jurisdiction relinquished.

¶ 37 LALLY–GREEN, J., Files a Dissenting Statement.

LALLY–GREEN, J., dissenting.

¶ 1 I agree with most of the analysis set forth by my learned colleagues in the majority. I question only one aspect of the majority opinion, which is the matter of the prejudice suffered by Appellant, Cynthia N. Papach, Administratrix of the Estate of Christopher K. Haws. I respectfully conclude that the record does not support a finding that Appellant was prejudiced by the trial court's admission of the ambulance report.

¶ 2 Our standard of review, to justify reversal of the trial court, is as follows:

> This Court will not reverse a trial court's decision regarding the grant or refusal of a new trial absent an abuse of discretion or error of law.... Further, if the basis of the request is the trial court's rulings on evidence, then **such rulings must be shown to have been not only erroneous but also harmful to the complaining party. Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment.**

*Antoniotti v. Eckels,* 840 A.2d 1013, 1015–1016 (Pa.Super.2003). In making this determination, **we must consider whether a new trial would produce a different verdict.** *Gunn v. Grossman,* 748 A.2d 1235, 1239 (Pa.Super.2000). If there is any support in the record for the trial court's denial of a new trial, we must affirm the trial court's order. *Id.*

*Folger ex rel. Folger v. Dugan,* 876 A.2d 1049, 1054 (Pa.Super.2005) (*en banc*) (emphasis added). It is the appellant's burden to establish the erroneous evidentiary ruling and the prejudice caused thereby. *Id.* at 1054–1055. *See also, Ford v. Ford,* 878 A.2d 894, 903 (Pa.Super.2005).

¶ 3 We apply this standard to the evidentiary ruling at issue, that is, the admission of the ambulance report despite its hearsay character. Assuming *arguendo* that the ruling was erroneous,[6] Appellant must establish that the error was prejudicial, *i.e.,* that exclusion of the evidence would have produced a different verdict.

¶ 4 The certified record on appeal does not include any notes of testimony from any of the proceedings in the trial court. This Court has often stated:

> "It remains the appellant's responsibility to ensure that a complete record is produced for appeal. Inclusion in the reproduced record is not an acceptable substitute for the original certified record. The failure of the appellant to ensure that the original record certified for appeal contains sufficient information to conduct a proper review may constitute a waiver of the issues sought to be examined."

---

**6.** There was a strong argument to be made for admission of the report pursuant to *Carroll v. Avallone,* 869 A.2d 522, 527–528 (Pa.Super.2005), because "experts reasonably and regularly rely on this type of information to practice their profession."

*Kessler v. Broder,* 851 A.2d 944, 950 (Pa.Super.2004), *quoting, Stewart v. Owens–Corning Fiberglas,* 806 A.2d 34, 37 n. 3 (Pa.Super.2002). It is axiomatic that an appellate court is limited to considering only those facts which have been duly certified in the record on appeal and, for purposes of appellate review, what is not of record does not exist. *Spink v. Spink,* 422 Pa.Super. 126, 619 A.2d 277, 280 n. 1 (1992).

¶ 5 The Majority astutely notes that Appellant complied with her duty to order the transcripts. The Majority also correctly points out that transmitting the documents to this Court is not Appellant's responsibility. Nevertheless, our case law has unfortunately made clear that Appellant may still be responsible for the absence of the necessary transcripts if she fails to "ensure" that the documents are included in the certified record *Kessler*; *Commonwealth v. Williams,* 552 Pa. 451, 715 A.2d 1101, 1105 (1998) (it is "the appellant's responsibility to order the transcript required **and** ascertain its presence in the record prior to certification for appeal.") (emphasis added). If there is any dispute as to where the fault lies, an evidentiary hearing may be in order. *Williams.*

¶ 6 Even if we could conclude on this record that the fault lies with court personnel and not with Appellant, the proper remedy would ultimately be for this Court to order the transcripts to be transmitted to this Court **before** deciding the merits. *See,* Pa.R.A.P. 1926; *United Nat'l Ins. Co. v. J.H. France Refractories Co.,* 558 Pa. 409, 737 A.2d 738 (1999) (per curiam).

¶ 7 Under the certified record as it currently exists, I cannot agree that Appellant carried her burden of establishing prejudice. Indeed, I do not believe that this Court can make any intelligent decision, pro or con, about the merits of the prejudice question without the missing transcripts. At best, a decision on the merits is premature.

¶ 8 Thus, I would conclude either that Appellant has waived her issue on appeal, or that a decision on the merits is premature. Under either analysis, I respectfully cannot join in an Opinion granting relief in the form of a new trial. Thus, I am constrained to dissent.