# Wachovia Bank N.A. v. Gemini Equipment Co.

*Ira A. Rosenau,* for plaintiff.
*Thomas W. Scott,* for defendant.

EVANS, *J.,* December 5, 2006—After more than seven years of litigation, this straight forward collection case concerning defendant Gemini's default on a loan and a line of credit finally was heard by the court in a non-jury trial on November 30 and December 1, 2005.[1] On May 25, 2006, this court issued detailed findings of fact and an order in favor of the plaintiff Wachovia Bank in the amount of $2,053,557.48. This amount included $1,849,272.83, representing the outstanding balances (principal and interest) owed to the bank as of the time of trial and attorney's fees in the amount of $204,284.65. Gemini's post-trial motions were denied on September 27, 2006, and an appeal is now pending before the Pennsylvania Superior Court.

The evidence introduced at trial established that on November 16, 1986, Gemini executed and delivered to the bank an unlimited guaranty in which Gemini agreed to act as the complete and unconditional surety of all monies then or thereafter due to the bank or its successors

---

1. This action against Gemini was commenced in 1998. After years of litigation, the matter was originally scheduled for a non-jury trial beginning January 18, 2005. On December 21, 2004, Gemini filed a voluntary petition for bankruptcy in the U.S. Bankruptcy Court for the Middle District of Pennsylvania, no. 1:04-07555, which stayed all proceedings in this court. After cancellation of the non-jury trial, Gemini filed a motion to withdraw the voluntary petition and the bankruptcy action was dismissed. The case was then re-scheduled for trial commencing May 26, 2005. Once again, on May 25, 2005, Gemini filed another voluntary petition for bankruptcy under Chapter 11. The stay was eventually modified to allow this litigation to proceed.

from Adams County Asphalt (ACA) on account of any loans made to ACA.[2] Amended guarantees were subsequently executed by Gemini in connection with increasing ACA's line of credit to $3,000,000 and a commercial loan to ACA in the amount of $100,000. When ACA defaulted on the loans, the bank exercised its right to accelerate all amounts due and demanded payment. Thereafter, both ACA and Gemini filed voluntary petitions for Chapter 11 bankruptcy. On July 7, 2005, the automatic stay was modified in the Gemini bankruptcy case, which allowed this litigation to proceed to trial, ultimately resulting in the entry of judgment against Gemini.

On appeal, Gemini claims that the court should have entered judgment in its favor based upon the bank's failure to present competent evidence to establish the outstanding amount of the debt, as well as Gemini's failure to pay. In establishing the amounts owed, the bank submitted the testimony of Jay Friedberg, Senior Vice President of Wachovia Bank. Mr. Friedberg testified to the principal and interest owed on the outstanding loans, utilizing the bank's computer-generated records. Gemini asserts that the bank failed to lay an adequate foundation for this testimony as Mr. Friedberg allegedly had no knowledge as to the manner in which the balances due were created or maintained by bank personnel.

In essence, Gemini alleges that the trial court erred in admitting plaintiff's evidence concerning the amount of

---

2. Defendant Gemini Equipment Business Trust is a successor to Gemini Equipment Co. and the sole shareholder of Adams County Asphalt.

the unpaid debt owed to the bank. This evidence consisted of exhibits P-18 and P-19 which were admitted as business records under Pa.R.E. 803(6), based upon the foundational evidence presented through the bank's witness, Jay Friedberg.[3] Gemini asserts three overlapping claims of error in this regard: (a) Mr. Friedberg lacked sufficient knowledge to be a "qualified witness" to testify as to the foundational elements under Pa.R.E. 803(6); (b) the bank records were not properly authenticated; and (c) the bank failed to lay the proper foundation for admission of the records under Pa.R.E. 803(6). We find Gemini's allegations to be without merit.

A. *The bank's computerized records establishing the outstanding balances due under the loan instruments were properly admitted under Pa.R.E. 803(6) as records of regularly conducted activity.*

Pa.R.E. 803(6) states that records of regularly conducted activity are not excluded by the hearsay rule:

"A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time, by or from information transmitted by a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regu-

---

3. Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence of record, discretion is abused. *Commonwealth v. Levanduski,* 907 A.2d 3, 13-14 (Pa. Super. 2006).

lar practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the custodian or other qualified witness, . . . unless the sources of information of other circumstances indicate a lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."[4]

Importantly, the official comments to Pa.R.E. 803(6) provide that the term "data compilation" encompasses records kept through "computerized data storage." Rule 803(6) places the burden on the proponent of the evidence to show circumstantial trustworthiness. The rule places the burden on the opposing party to show that the sources of information or other circumstances indicate that a business record is untrustworthy, and thus does not qualify for exception to the hearsay rule. *Official Comments* to Pa.R.E. 803(6). See also, *Commonwealth v. Schoff,* 2006 Pa. Super. 307, 2006 Pa. Super. Lexis 3557 (2006). Thus, under Pa.R.E. 803(6), the foundation for admissibility of business information is that (a) the record was made and kept in the course of regular business activity; (b) the record was made by, or from information provided by, a person who had knowledge of the information recorded; and (c) the record was made at or near the time of the recorded act, event or condition.

---

4. See also, The Uniform Business Records as Evidence Act, 42 Pa.C.S. §6108(b) which provides that "a record of an act shall be competent evidence if a qualified witness testifies to its identity and the mode of its preparation, if it was made in the regular course of business at or near the time of the act and if the tribunal believes the sources of information, method and time of preparation were such as to justify its admission."

The justification for this hearsay exception is that business records have a high degree of accuracy because the nation's business demands it, because the records are customarily checked for correctness, and because record keepers are trained in habits of precision. *Papach v. Mercy Suburban Hospital,* 887 A.2d 233, 246 (Pa. Super. 2005). Double hearsay exists when a business record is prepared by one employee from information supplied by another employee. *Id.* If both the source and the records of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Pa.R.E. 803(6). *Id.*

Herein, we find that the testimony of Jay Friedberg met all of the foregoing requirements. Accordingly, a proper foundation was established for the admission of exhibits P-18 and P-19. Mr. Friedberg explained his history with Wachovia Bank dating back to 1987; his role in connection with the documents being introduced as business records; and his status as custodian of the bank's records. He has been employed by Wachovia Bank or its predecessors (Hamilton Bank, Corestates and First Union) since 1987. (N.T. 11/30/05 at 17.) Currently, he is a senior vice president. (N.T. 11/30/05 at 17.) He has been involved in the bank's relationship with defendant Gemini since 1994 or 1995 and is responsible for overseeing the litigation surrounding the defendant's guarantees following ACA's default. (N.T. 11/30/05 at 18.) He is the person responsible for maintenance of the Gemini file and is considered the custodian of that file. (N.T. 11/30/05 at 18-19.) He reviewed the bank's file regarding Gemini before appearing in court and confirmed that the documents he reviewed

are kept in the ordinary course of the bank's business. (N.T. 11/30/05 at 18-19.)

Mr. Friedberg explained his familiarity with the bank's electronic record-keeping system for each and every loan booked by the bank, and how those records are maintained in the ordinary course of business. In his position as a senior vice president, Mr. Friedberg is familiar with the procedures utilized by the bank in producing the documents. Specifically, after a loan closing takes place, with the signing of obligations, notes and security agreements, the documents are then transferred onto a loan information system by book entry, which involves sending a copy of the note to the bank's central accounting system. (N.T. 11/30/05 at 37.) A computer profile is set up for every loan and the records are kept on a mainframe computer which is accessed by authorized bank personnel. (N.T. 11/30/05 at 38.) When a payment is received on the loan or line of credit, the payment information is sent through the system via a series of "application tickets" which reflect the amount of the payment and how much is allocated to interest and principal. The entry of debits and credits is routinely performed by a bank specialist. (N.T. 11/30/05 at 38.) The computerized loan records are kept in the ordinary course of business and track payments, interest and adjustments. (N.T. 11/30/05 at 41-42.) The bank is required by law to keep accurate books and records of all loans in the portfolio. The computerized records are utilized to determine compliance and are also utilized for internal and external audits. (N.T. 11/30/05 at 41.)

Based upon the documentary evidence presented, as well as the testimony of Mr. Friedberg, this court deter-

mined that the outstanding amount owed on the ACA line of credit, including principal and interest, was $1,773,545.77 and the aggregate balance due on the $100,000 loan was $75,727.07 through the date of the hearing. (Exhibits P-18, P-19 and P-31; N.T. 11/30/05 at 51.) Accordingly, judgment was entered in favor of the bank and against Gemini as the guarantor of ACA's loans, in the amount of $1,849,272.83.

This court found that Mr. Friedberg properly laid the foundation for the admission of P-18 and P-19. He established how the baseline loan balance was established at or near the time of loan origination and how payments were allocated and entered into the system at or near the time they were received. He also established that the computerized data was kept in the regular course of the bank's business. The bank is required to keep accurate records by law and the records are subject to both internal and external audits, which substantially supports their overall trustworthiness.

Against this foundation, Gemini bore the burden of proving that the records were untrustworthy. Gemini objected to admission of the computerized data on the basis that Mr. Friedberg was not competent to be an appropriate sponsor for the documents because he had no role in creating them and did not oversee their preparation. This objection is entirely without merit. A witness testifying to the foundational elements under Rule 803(6) is not required to have personal knowledge of the circumstances surrounding each and every entry made in the business records. Rather, the witness must have knowledge about how the records are created and maintained in the ordinary course of business.

Contrary to Gemini's position, the Pennsylvania courts have regularly held that the testifying witness need not have personal knowledge of the facts reported in the business records. It is the business purpose of the record, rather than the employee status of the source, which renders such hearsay evidence especially reliable. *Toth v. Workers' Compensation Appeal Board (USX Corp.),* 737 A.2d 838, 841 (Pa. Commw. 1999). As stated in *Boyle v. Steinman,* 429 Pa. Super. 1, 631 A.2d 1025 (1993):

"The purpose of Uniform Business Records as Evidence Act is to create an additional exception to the hearsay rule in circumstances where a record of an act, a condition or an event was made in the regular course of business, at or near the time of the act, condition or event and where the sources of information, method and time of preparation were such as to justify its admission. *Joseph v. Krull Wholesale Drug Co.,* 147 F. Supp. 250 (E.D. Pa. 1956), *affirmed,* 245 F.2d 231 (3d Cir. 1957). The question of whether documents should be admitted under the "business records" exception to the hearsay rule is within the discretionary power of the trial court provided such discretion is exercised within the Uniform Business Records as Evidence Act. *Thomas v. Allegheny & Eastern Coal Co.,* 309 Pa. Super. 333, 340, 455 A.2d 637, 640 (1982). It is not essential under the Uniform Business Records as Evidence Act to produce either the person who made the entries or the custodian of records at the time the entries were made. *In re Indyk's Estate,* 488 Pa. 567, 573, 413 A.2d 371, 373 (1979). Moreover, the law does not require that a witness qualifying business records even have a personal knowledge of the facts

reported in the business record. *Wayne County Board of Assessment v. Federation of Jewish Philanthropies,* 43 Pa. Commw. 508, 403 A.2d 613 (1979). As long as the authenticating witness can provide sufficient information relating to the preparation and maintenance of the records to justify a presumption of trustworthiness for the business records of a company, a sufficient basis is provided to offset the hearsay character of the evidence. *In re Indyk's Estates, supra,* at 573, 413 A.2d at 373." *Id.,* 429 Pa. Super. at 15, 631 A.2d at 1032-33 (1993), *allocatur denied,* 538 Pa. 663, 649 A.2d 666 (1994); see also, *Commonwealth v. McEnany,* 732 A.2d 1263, 1272 (Pa. Super. 1999); *Peled v. Meridian Bank,* 710 A.2d 620, 625 (Pa. Super. 1998); *Fordham v. PennDOT,* 663 A.2d 868, 872 (Pa. Commw. 1995); *Commonwealth v. Wood,* 432 Pa. Super. 183, 212-13, 637 A.2d 1335, 1349-50 (1994); *Campbell v. Royal Indemnity Company of New York,* 256 Pa. Super. 312, 389 A.2d 1139 (1978).

Likewise, we find that Gemini is incorrect when it contends that Mr. Friedberg was not a "qualified witness" under Pa.R.E. 803(6). For purposes of the rule, the term "qualified witness" is to be given the broadest interpretation and only requires that the witness understands the system he is describing. *United States v. Pellulo,* 964 F.2d 193, 201 (3d Cir. 1992). Similarly, we reject Gemini's contention that Mr. Friedberg's testimony was insufficient to authenticate P-18 and P-19. Gemini claims that the records were not properly authenticated because the bank's loan tracking computer systems went through conversions over the years. This argument is meritless for several reasons.

First, Gemini failed to raise an authenticity objection at trial, and therefore, the objection is waived at this juncture. It is axiomatic that an objection to the admission of evidence is waived if not timely raised at trial. *Takes v. Metropolitan Edison Company,* 548 Pa. 92, 99, 695 A.2d 397, 400 (1997). While Gemini's counsel raised objections to the admission of the documents as hearsay, there was no objection based on the lack of authenticity of the document. Even if the objection had been properly preserved, this court finds that exhibits P-18 and P-19, which contained the computerized data, were properly authenticated by Mr. Friedberg.

Pa.R.E. 901 sets forth the requirement of authentication or identification and provides in relevant part:

"(a) *General Provision.* The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

"(b) *Illustrations.* By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

"(1) *Testimony of Witness With Knowledge.* Testimony that a matter is what it is claimed to be. . . .

"(9) *Process or System.* Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result."

The bank's computerized loan records were authenticated under each of the foregoing rules. Mr. Friedberg testified about his knowledge of the conversion of the

Hamilton Bank computer system into the current system; his experience that the conversion went smoothly; and that the computer system was audited. (N.T. 11/30/05 at 59-64.) Every loan owned or processed by the bank runs on this same system. Thus, from his own knowledge, Mr. Friedberg testified that the records were what they purported to be and that the documents were reliable.

Based upon the foregoing, Gemini is simply wrong in its assertion that the bank's witness, Jay Friedberg was not qualified. We also reject Gemini's contention that Mr. Friedberg's testimony failed to establish that the data compilation was made at or near the time from information transmitted by a person with knowledge and kept in the ordinary course of business. The testimony established that payments were applied to the outstanding loan balances, by authorized bank personnel, at or near the time the payments were received and that such records were kept on every loan in the bank's portfolio as part of its regular business practice.

B. *The entry of an order precluding Gemini from interposing any defenses to the bank's claims was an appropriate sanction for defendant's willful and repeated discovery abuses.*

Next, Gemini contends that the court erred in granting plaintiff's motions in limine essentially precluding Gemini from interposing any defenses to the bank's claims. Gemini alleges that this was a drastic remedy which resulted in a denial of due process.[5] First, we note

---

5. Plaintiff's motions included (1) a motion in limine to exclude impairment of collateral defense; (2) a motion in limine to exclude accord and satisfaction defense; and (3) a motion in limine to bar all defenses.

that Gemini was given more than due and sufficient notice of the bank's motions in limine; Gemini was given the opportunity to present its legal and factual response to the motions; and Gemini filed written opposition to each. Thus, no due process was denied Gemini.

Further, the motions were granted based upon Gemini's long history of willful and repeated discovery abuses. Specifically, on January 27, 1999, the bank served Gemini with a request for production of documents in this case, as well as document requests in a related action (against ACA). When no documents were produced, the bank filed a motion to compel. On February 10, 1999, the court entered an order requiring that the requested documents be produced to the bank before March 24, 1999. When Gemini still refused to produce the documents, the bank filed another motion to compel. On June 15, 1999, the court entered another order requiring defendant's production of all documents by August 16, 1999. Once again, the order was ignored.

After the bank provided informal discovery to defendant and after settlement negotiations broke down, the bank again sought to obtain the documents from Gemini. When those efforts failed, in July 2000, the bank requested that the court order production of the documents. Following a conference with the court, yet another order was entered directing Gemini, among other things, to produce documents which were already in the possession of defense counsel no later than September 15, 2000, with the remaining documents to be produced by November 1, 2000.

As before, Gemini ignored the third order. Not a single document was produced to the bank by September 15, 2000. Again, the bank was forced to file another motion with the court on October 2, 2000, seeking sanctions for defendant's discovery abuses. Following another conference on November 8, 2000, the court scheduled a sanctions hearing for December 18, 2000. Facing imminent sanctions, on December 11, 2000, after three court orders and two-and-a-half years of delay, Gemini produced three small boxes of documents to plaintiff.

After the sanctions hearing, the court entered an order on January 26, 2001 directing Gemini to pay attorney's fees in the amount of $3,000, and ordering defendant to file an appropriate affidavit certifying that all available discovery documents had been submitted to plaintiff "no later than seven days from the receipt of this order by defendant's counsel." Once again, Gemini refused to comply with the court's instructions: neither the $3,000 sanction nor the affidavit were delivered as ordered. The bank then filed another motion for sanctions on May 26, 2001.[6]

Despite the imposition of discovery sanctions and four court orders mandating production of all documents, the deposition of Gemini's corporate designee, Robert Mumma II, revealed that Gemini still had not and would not produce its documents. During the June 5, 2001 deposition, Mr. Mumma admitted that he had 100 boxes of potentially responsive documents that he had never bothered to review. (Mumma depo. at 47-48, 53-54.)

---

6. The sanctions were finally paid on December 13, 2001, nearly 11 months after the court ordered them to be paid. The affidavit of compliance is discussed below.

On December 10, 2001, Gemini finally submitted the affidavit required by the fourth court order almost 11 months earlier. In that affidavit, Gemini misrepresented that there were no other responsive documents in its possession. The affidavit was patently false in light of Mr. Mumma's deposition testimony and Gemini's admission in response to the sanctions motion that "at the deposition, Mr. Mumma indicated unequivocally that he believed that there were additional documents that related to the merits of the plaintiff's claims and the Mumma parties' defenses and counterclaims, but that they were scattered among approximately 100 boxes located in various places, the Mumma parties' offices having been moved three times since 1993." (Defendants' response to rule to show cause why plaintiff's motion for sanctions should not be granted, filed December 10, 2001.) Thus, the sworn affidavit was directly contradicted by Mr. Mumma's deposition testimony and Gemini's subsequent admission that other responsive documents existed within the 100 boxes of documents in the possession of the corporate designee that were never produced.

On April 15, 2002, the court held another hearing on Gemini's discovery abuses. As a result, on May 6, 2003, the court entered a fifth discovery order which, among other things, barred Gemini from seeking any discovery from any party or non-party. Quite unbelievably, after the long and tortuous history set forth above, Gemini continued to violate the court's orders and withheld discovery to which the bank was entitled. Mr. Mumma's deposition continued on May 20, 2003, with Mr. Mumma refusing to provide information relating to Gemini's

defenses, despite the court's May 2003 order that Gemini was to provide deposition discovery. The deposition transcript reveals that at virtually every turn, Mr. Mumma refused to answer questions about Gemini's defenses in this case. (Mumma depo. at 4-10, 23-29, 31-33, 36-37.)

Thus, despite the court's order, Gemini simply refused to provide any information about its defenses that (a) sums were paid to the bank on account of the loans; (b) collateral was impaired in a 1995 asset transaction; and (c) the bank and Gemini reached an accord and satisfaction relieving any interest obligation in connection with the loans. Faced with repeated discovery abuses, the bank filed motions in limine on December 30, 2004, seeking to preclude Gemini from introducing evidence in support of these defenses at trial. Gemini's response to these motions provided no excuse for the continued violations and instead, asserted that preclusion was too harsh a sanction. While Gemini argued that its repeated failure to obey the discovery orders did not result in any prejudice to the plaintiff, this court found to the contrary. Accordingly, the motions were granted on October 13, 2005.

Pa.R.C.P. 4019(a)(1)(viii) authorizes the court to "make an appropriate order if a party or person otherwise fails to make discovery or to obey an order of court respecting discovery." Rule 4019(c)(2) authorizes the court to enter an order "refusing to allow the disobedient party to support or oppose designated claims or defenses or prohibiting such party from introducing in evidence designated documents, things or testimony...." Importantly, the decision whether to sanction a party for discovery abuses and the severity of the sanction imposed

are within the sound discretion of the trial court. *Croydon Plastics Co., Inc. v. Lower Bucks Cooling & Heating,* 698 A.2d 625, 629 (Pa. Super. 1997), *alloc. denied,* 553 Pa. 689, 717 A.2d 1028 (1998).

Under less severe circumstances than those presented in this case, courts have entered preclusion orders against chronic discovery abusers. In *Smith v. Philadelphia Gas Works,* 740 A.2d 1200 (Pa. Commw. 1999), the appellate court upheld the trial court's decision to preclude the plaintiff in a personal injury case from presenting evidence due to his failure to produce documents requested by the defense. In that case, the disobedient party refused to comply with just two discovery orders (unlike the five discovery orders in this case) before the trial court prohibited the plaintiff "from introducing any type of evidence, including evidence of physical condition, at the time of trial." *Id.,* 740 A.2d 1202.

In *Croydon Plastics Co.,* after the defaulting party ignored three court orders to produce expert reports, the trial court precluded the expert from testifying at trial. In upholding the trial court ruling, the Superior Court's opinion has particular application to this case:

"Presently, the prolonged tautology of this case demonstrates that the trial court was faced with a situation in which, after repeated discovery violations, it ordered Croydon to file an expert report within 60 days. Further, the court unambiguously stated that the failure to comply would result in a preclusion order. Nevertheless, Croydon failed to comply with the court's order for over one year. Then when asked by the court to explain its dilatory behavior, Croydon gave answers which were, at turns, implausible, incredible and irrelevant. . . .

"This evidence amply supports a finding that Croydon repeatedly and willfully failed to comply with court orders respecting discovery. If the information was available, Croydon should have furnished it as soon as practicable. . . .

"In sum, we find that the trial court acted within the bounds of its permissible discretion in entering the preclusion order against Croydon. While this sanction was certainly severe, it was not imposed hastily or without regard for its ramifications. Although Croydon was allotted 60 days to comply with the court order, it saw fit to sit in silence and disobey the unambiguous edict for over one year. Any complaints that Croydon presently aver prohibited it from compliance should properly have been addressed to the trial court at some point during the 14-month interval between the discovery order and sanction." *Id.,* 698 A.2d at 629-30.

In *Pioneer Commercial Funding Corp. v. American Financial Mortgage Corp.,* 797 A.2d 269 (Pa. Super. 2002) *rev'd on other grounds,* 579 Pa. 275, 855 A.2d 818 (2004), the court upheld the trial court's decision to preclude a witness from testifying because the witness was part and parcel of numerous discovery violations. In a summary reminiscent of the problems in this case, the Superior Court noted that "[t]he violations included withholding critical documents, failure to comply with requests for documents despite the entry of numerous discovery orders, production of critical documents on the eve of trial and in the middle of trial, etc." *Id.,* 797 A.2d at 287.

Herein, notwithstanding five prior orders and the imposition of lesser (including monetary) sanctions, Gemini still refused to produce all of the documents it

admits it had its possession. In Gemini's own words, it believed that there were additional documents relating not only to the merits of the bank's claims, but also to its defenses and counterclaims that were "scattered among approximately 100 boxes located in various places." None of these documents were produced, despite being ordered to do so since 1999. Further, even after the court ordered the case to go forward and deposition discovery to be provided, Gemini's designee refused to answer questions about the defenses it had interposed. In light of the foregoing, we find that the remedy of preclusion appropriately addressed Gemini's longstanding willful and obdurate conduct.

On appeal, Gemini contends that the court erred by excluding evidence which supposedly contradicted the plaintiff's complaint and by limiting the topics explored by Gemini's counsel during cross-examination of Mr. Friedberg. Neither argument has merit.

Under well-established Pennsylvania law, the trial court has considerable discretion and latitude in determining the admissibility of evidence. Indeed, it is axiomatic that a trial court's evidentiary decisions are not to be disturbed absent a clear abuse of discretion or error of law. See *e.g., Eichman v. McKeon,* 824 A.2d 305, 319 (Pa. Super. 2003); *Concorde Investments Inc. v. Gallagher,* 345 Pa. Super. 49, 56, 497 A.2d 637, 641 (1985). Here, Gemini has not shown that the court abused its discretion or committed an error of law. To the contrary, the court properly entered an order barring all of Gemini's defenses for its unabated discovery abuses and since the "proffered" evidence cited in Gemini's post-trial brief only went to the barred defenses, preclusion at trial was proper.

Similarly, the court did not err in limiting the scope of Gemini's cross-examination of Mr. Friedberg. In its brief, Gemini argues only in generalities and fails to identify specific questions or rulings it challenges. Moreover, the alleged errors in limiting defense counsel's cross-examination into "bank record documents" and the "release of collateral" are not errors. As the notes of testimony demonstrate, the court ruled that the release of collateral issue was irrelevant in light of the earlier order that the impairment of collateral defense was barred at trial.[7] (N.T. 11/30/05 at 93-94.)

C. *The award of attorney's fees was specifically authorized in the loan documents and the award in this instance was reasonable.*

Finally, Gemini takes issue with the court's award of attorney's fees, alleging first that because plaintiff bank

---

7. Even if the impairment of collateral defense was not barred by virtue of Gemini's repeated discovery abuses, we would have precluded such evidence at trial since the undisputed facts demonstrate that there were express waivers of the impairment of collateral defense in the June 11, 1993 guaranty executed by Gemini (exhibit P-8). Pennsylvania statutory and case law is clear that these waivers are binding and enforceable. *First National Consumer Discount Company v. McCrossan,* 336 Pa. Super. 541, 550, 486 A.2d 396, 400 (1984) quoting *Ford Motor Credit Co. v. Lototsky,* 549 F. Supp. 996, 999 (E.D. Pa. 1982) ("[the] defense of impairment of collateral, although firmly embedded in Pennsylvania common law, must give way to the equally entrenched proposition that an explicit waiver precludes a guarantor [or a surety] from asserting them in an action to recover under the guaranty."); *McKeesport National Bank v. Rosenthal,* 355 Pa. Super. 291, 294, 513 A.2d 434, 436 (1986) (where the guaranty is "absolute and unconditional and does not require the creditor to take any action to preserve the security, the creditor's failure to do so will not relieve the surety's obligation to pay upon default").

failed to establish the amounts due and owing under the instruments through competent, admissible evidence, fees should not have been awarded. For the reasons set forth above, we reject this assertion. In addition, Gemini alleges that the award was not supported by sufficient evidence to establish that the fees were incurred in conjunction with the furtherance of this collection matter or were for services reasonable and necessary to the prosecution of the bank's claim.

Under Pennsylvania law, attorneys' fees can be awarded to a party in litigation where there is a specific statute authorizing such an award or an agreement between the parties. See *Snyder v. Snyder,* 533 Pa. 203, 212, 620 A.2d 1133, 1138 (1993); *Lavelle v. Koch,* 532 Pa. 631, 638, 617 A.2d 319, 323 (1992). Here, pursuant to the loan documents, Gemini agreed to pay the bank all costs and expenses, including reasonable attorneys' fees which may be incurred in the enforcement of ACA's liabilities to the bank or Gemini's liabilities under the guarantees. (Exhibit P-7 at p. 2; exhibit P-8 at para. 6; and exhibit P-9.)

At trial, the bank presented evidence concerning attorneys' fees and costs incurred through Morton R. Branzburg, Esquire of Klehr, Harrison, Harvey, Branzburg and Ellers LLP, counsel to the bank. Mr. Branzburg testified about his extensive legal experience; his knowledge of and experience with legal fee rates being charged in Pennsylvania for commercial and insolvency litigation; his familiarity with Klehr Harrison's legal services rendered in this matter; and his familiarity with Klehr Harrison's methodology and practice in recording billable time and generating bills for services rendered.

In support of its claim for attorneys' fees, the bank introduced a document, P-32, outlining the services rendered by Klehr Harrison to plaintiff bank in attempting to enforce and collect on the signed instruments. The exhibit included a description of each service rendered, the value of each service rendered at a discounted rate offered to the bank, and the value of each service rendered at Klehr Harrison's standard billing rates. Mr. Branzburg testified that Klehr Harrison, from the inception of the retention until November 30, 2000, billed the bank for each service rendered based on its discounted hourly rate on a regular, periodic basis.

Based upon Mr. Branzburg's testimony and exhibit P-32, the time value of services rendered by Klehr Harrison to the bank at the firm's standard billing rates through the end of November 2000 was $36,321.70, which amount was paid by the bank. Mr. Branzburg testified that, as of December 1, 2000, the firm altered its fee agreement with the bank so that compensation would be on a contingent basis (35 percent contingent fee arrangement), but the bank remained obligated to pay for all costs incurred in attempting to enforce the loan documents. (N.T. 12/1/05 at 12-13.) Additionally, Mr. Branzburg testified about the types of services that were rendered, the extent of counsel's labor on the case, the time required, and how the rates charged reasonably compared to the prevailing rates in the community during the relevant time. (N.T. 12/1/05 at 14-16, 18.) He also testified concerning the firm's efforts to keep the amount of time and money spent on these disputes to a reasonable amount. (N.T. 12/1/05 at 17-18.)

Based upon the testimony of Mr. Branzburg, this court concluded that the time value of services rendered by Klehr Harrison to the bank, at the firm's standard billing rates, was $204,284.65 through the end of October 2005, which amount excluded time for trial preparation as well as the actual trial. This award was based upon the evidence presented, as well as from the court's own experience and its oversight of this litigation. This court further specifically found that the legal services provided by Klehr Harrison to the bank were of high quality; that the amount of time spent on the matter was reasonable and that the hourly rates were comparable to prevailing rates in the community during the relevant time. Accordingly, we find the award was proper.